# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
October 2003 Session

# JAMES H. KELLEY, et al. v. MIDDLE TENNESSEE EMERGENCY PHYSICIANS, P.C., et al.

### Appeal from the Circuit Court for Davidson County
No. 00C-1559     Barbara N. Haynes, Judge

---

### No. M2001-00702-SC-R11-CV - Filed April 23, 2004

---

We granted review to determine whether the trial court erred in granting summary judgment to the defendants in this medical malpractice lawsuit. The trial court concluded that there was no genuine issue of material fact and that, as a matter of law, no physician-patient relationship existed. The Court of Appeals reversed the judgment of the trial court. After careful review of the record before us and the applicable authorities, we conclude that there are disputed issues of fact as to the existence of a physician-patient relationship, and we therefore affirm the decision of the Court of Appeals. The case is remanded to the trial court for further proceedings consistent with this opinion.

### Tenn. R. App. P. 11, Appeal by Permission; Judgment of the Court of Appeals Affirmed; Judgment of the Trial Court Reversed, and Remanded

WILLIAM M. BARKER, J., delivered the opinion of the court, in which FRANK F. DROWOTA, III, C.J., and E. RILEY ANDERSON, ADOLPHO A. BIRCH, JR., and JANICE M. HOLDER, JJ., joined.

C. J. Gideon, Jr., Brian Cummings, and Kenneth P. Flood, Nashville, Tennessee, for the Appellants, John Cage, M.D. & Mid-State Cardiology Associates, P.C.

Daniel L. Clayton, Nashville, Tennessee, and Steven R. Walker, Memphis, Tennessee, for the Appellees, James H. Kelley, Joshlane Rachel Ware, and Joseph Lovell Ware.

**OPINION**

**FACTUAL BACKGROUND[1]**

On April 18, 1999, Mrs. Lillie Kelley went to the emergency room at Baptist Hospital in Nashville complaining of chest discomfort that had progressively worsened. She was diagnosed as having had an acute myocardial infarction (a heart attack) and was admitted to the hospital. A cardiac catheterization was performed and was conclusive for a blood clot in Mrs. Kelley's left anterior descending artery.

During her hospitalization, Mrs. Kelley was treated by Dr. William Fleet, a cardiologist employed by Mid-State Cardiology Associates, P.C. ("Mid-State"). A hematologist also evaluated Mrs. Kelley and recommended that her blood should be medically maintained "on the high side" of anticoagulation.[2] Mrs. Kelley was treated with anticoagulants and other medications and was discharged from the hospital after four days.

On June 10, 1999, Mrs. Kelley again went to the emergency room at Baptist Hospital and was seen and treated by Dr. John Anderson, an emergency physician. At that time, Mrs. Kelley complained of chest pain similar to the pain she had experienced with her heart attack two months earlier. Dr. Anderson testified in his deposition that he reviewed the medical records from Mrs. Kelley's earlier admission. Dr. Anderson also testified that it is his "course of practice" to call the patient's regular physician(s) after reviewing the patient's history and physical examination, and the results of the patient's diagnostic tests. Dr. Anderson therefore contacted Dr. Thomas Patten, Mrs. Kelley's primary care physician, and discussed her condition with him.

Dr. Anderson testified that he also attempted to contact Dr. Fleet by telephone. As Dr. Anderson stated, "I knew that she had had an MI and was treated by Dr. Fleet within two months. I felt it was imperative to call the cardiologist." However, when his staff called Mid-State's office, Dr. Fleet was not available. Being unable to reach Dr. Fleet, Dr. Anderson spoke instead to Dr. John Cage, also a cardiologist employed by Mid-State. According to Dr. Anderson, he ended up talking with Dr. Cage because Mid-State "has a rotation that they pick the physicians to answer the emergency calls."

Dr. Anderson told Dr. Cage that the patient was a thirty-eight year old female who had been treated by Dr. Fleet at the time of her heart attack in April 1999. Dr. Anderson informed Dr. Cage that Mrs. Kelley had atypical chest pain lasting over twelve hours, that her clinical exam was fairly

---

[1]Like the parties' respective briefs, our summary of the facts is based upon the allegations in the complaint, the defendants' answers, the affidavit of Dr. John Cage, and the deposition of Dr. John Anderson.

[2]According to the complaint, Mrs. Kelley had a "hypercoaguable syndrome probably caused by systemic lupus erythematosus."

unremarkable, that there were no new EKG changes, and that she had a normal troponin I level.[3] Dr. Cage asked whether a cardiac catheterization had been performed in April 1999; Dr. Anderson stated that a cardiac catheterization had been performed and that it showed Mrs. Kelley had an occluded left anterior descending artery and no other disease. Dr. Cage then asked Dr. Anderson if any intervention was done in April 1999; Dr. Anderson replied that the medical records indicated that no intervention had been done and that the treating physician (Dr. Fleet) had concluded that medical therapy was indicated. Dr. Anderson and Dr. Cage then discussed how to treat Mrs. Kelley's current chest pain; they agreed that Mrs. Kelley could be treated symptomatically, with follow-up care within the next day or two with Dr. Patten or Dr. Fleet. After his telephone conversation with Dr. Cage, Dr. Anderson released Mrs. Kelley from the hospital with instructions regarding her medications and with instructions to follow-up with her regular physician.

On June 11, 1999, Mrs. Kelley called Dr. Patten regarding her emergency room visit the previous day. She also had a new complaint of "charlie horses" in both legs. Dr. Patten prescribed pain medication.

Mrs. Kelley presented to Dr. Patten's office on June 14, 1999, with complaints of her heart racing, diaphoresis,[4] and mild chest discomfort. Dr. Patten believed that her pre-existing anemia was the probable cause of the palpitations she was experiencing. He performed an EKG, which was within normal limits. Dr. Patten instructed Mrs. Kelley to increase her anticoagulant medication and then to return to Dr. Fleet for further evaluation.

Mrs. Kelley called Heritage Medical Associates, Dr. Patten's physician group, on June 16, 1999, and spoke with Dr. Susan Berkebile. (Dr. Patten apparently was not available.) Dr. Berkebile prescribed a "GI cocktail"[5] for Mrs. Kelley. Mrs. Kelley again called Heritage Medical Associates on June 17, 1999, to report discomfort in her chest. When Dr. Patten returned her call, he was informed that she had gone to the emergency room at Baptist Hospital. Upon Mrs. Kelley's arrival at Baptist Hospital, she suffered an acute cardiopulmonary arrest and went into a comatose state; she was pronounced dead approximately one hour after her arrival at the hospital.

---

[3]Troponin is a family of proteins found in skeletal and heart muscle fibers that helps muscles contract. There are two types of troponin (troponin I and troponin T) found in the heart and in other muscles. The tests for these forms of troponin measure only the type found in the heart muscle. When a person has a heart attack, troponin is released into the bloodstream. The troponin I level is very low in normal healthy people but is elevated in persons who have recently experienced a heart attack. Thus, the troponin levels may be tested in persons who have experienced chest pain to determine if they have had a heart attack or other heart damage. See Clinical Laboratory Tests: Values and Implications 597-98 (Naina D. Chohan et al. eds., 3d ed. 2001).

[4]Diaphoresis is a medical term for profuse sweating. See Mosby's Medical, Nursing, & Allied Health Dictionary 517 (Douglas M. Anderson ed., 6th ed. 2002).

[5]Heart failure typically causes a number of symptoms and complications, so heart attack patients may need to take a "cocktail" of several types of medicines, such as an analgesic drug for pain relief, a thrombolytic drug to dissolve the blood clot, and an ACE inhibitor or diuretic drug if the pumping action of the heart is impaired. See American College of Physicians Complete Home Medical Guide 410-11 (David R. Goldmann ed., 2d ed. 2003).

Mrs. Kelley's surviving spouse and her children filed suit against numerous defendants, including Dr. Cage and Mid-State.[6]  Dr. Cage and Mid-State filed a motion for summary judgment, asserting that no physician-patient relationship existed between Dr. Cage and Mrs. Kelley and, in the alternative, that Dr. Cage complied with the standard of care.  In support of their motion for summary judgment, Dr. Cage and Mid-State filed an affidavit signed by Dr. Cage.  In his affidavit, Dr. Cage stated that at the time of his conversation with Dr. Anderson, he (Dr. Cage) was "completely unaware" of Mrs. Kelley, that Mrs. Kelley never personally contacted him, and that he was never asked to see Mrs. Kelley.  Dr. Cage also stated that he never "knowingly accepted Lillie Kelley as a patient" and "never provided any medical services to Lillie Kelley."

The trial court granted summary judgment to Dr. Cage and Mid-State, finding as a matter of law that no physician-patient relationship existed between Dr. Cage and Mrs. Kelley.  Due to that ruling, the trial court did not address the issue of the standard of care.  The Court of Appeals reversed the trial court's grant of summary judgment, concluding that there were genuine issues of material fact regarding the existence of a physician-patient relationship and regarding Dr. Cage's compliance with the applicable standard of care.

The defendants filed an application for permission to appeal to this Court, asserting that the existence of a physician-patient relationship is an "essential element" of a medical malpractice case and that the trial court correctly granted summary judgment to the defendants on that issue.  We granted the defendants' application for permission to appeal.  For the reasons stated below, we now affirm the Court of Appeals' reversal of summary judgment and remand for further proceedings consistent with this opinion.

## STANDARD OF REVIEW

Summary judgment is appropriate where the moving party establishes "that there is no genuine issue as to any material fact and that a judgment may be rendered as a matter of law."  Tenn. R. Civ. P. 56.04; see also Bain v. Wells, 936 S.W.2d 618, 622 (Tenn. 1997).  In reviewing a motion for summary judgment, the Court must examine the evidence and all reasonable inferences from the evidence in the light most favorable to the non-moving party and must discard all countervailing evidence.  Mooney v. Sneed, 30 S.W.3d 304, 305-06 (Tenn. 2000); Byrd v. Hall, 847 S.W.2d 208, 210 (Tenn. 1993).  This Court's review of the trial court's summary judgment ruling is de novo with no presumption of correctness.  McNabb v. Highways, Inc., 98 S.W.3d 649, 652 (Tenn. 2003); Scott v. Ashland Healthcare Ctr., Inc., 49 S.W.3d 281, 285 (Tenn. 2001).

## ANALYSIS

Dr. Cage and Mid-State assert that proof of a physician-patient relationship is an "indispensable element" of a medical malpractice claim against a physician.  They contend that Dr.

---

[6]Dr. Cage and Mid-State are the only defendant parties in this appeal.

4

Cage's actions in this case amounted to nothing more than a "curbside consultation" and that the undisputed facts in the record fail to establish a physician-patient relationship between Dr. Cage and Mrs. Kelley. Accordingly, Dr. Cage and Mid-State assert that the trial court correctly granted their motion for summary judgment.

The plaintiffs argue in response that a physician-patient relationship is not an indispensable element of a medical malpractice action and that Dr. Cage owed Mrs. Kelly a duty of care irrespective of the existence of such a relationship. In the alternative, the plaintiffs assert that there are disputed issues of fact as to the existence of a physician-patient relationship between Dr. Cage and Mrs. Kelley.

PHYSICIAN-PATIENT RELATIONSHIP & DUTY OF CARE

The starting point in reviewing a medical malpractice case is section 29-26-115(a) of the Tennessee Code Annotated. See Kilpatrick v. Bryant, 868 S.W.2d 594, 597 (Tenn. 1993). That statute provides that the plaintiff in a medical malpractice case has the burden of proving the following:

> (1) The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which the defendant practices or in a similar community at the time the alleged injury or wrongful action occurred;

> (2) That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and

> (3) As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.

Tenn. Code Ann. § 29-26-115(a) (2000).

The Medical Malpractice Act[7] does not explicitly require the plaintiff to prove that the defendant owed the plaintiff a duty of care. However, as we previously have stated, the Act "codifies the common law elements of negligence–duty, breach of duty, causation, proximate cause, and damages. No claim for negligence can succeed in the absence of any one of these elements." Kilpatrick, 868 S.W.2d at 598 (citations omitted); see also Gunter v. Lab. Corp. of Am., 121 S.W.3d 636, 639-40 (Tenn. 2003); Burroughs v. Magee, 118 S.W.3d 323, 327-28 (Tenn. 2003), reh'g denied (Tenn. Oct. 28, 2003). The question of whether the plaintiff in a medical malpractice action must

---

[7]Tennessee's medical malpractice statute was originally titled the "Medical Malpractice Review Board and Claims Act of 1975." However, when sections 29-26-101 to 29-26-114 were repealed in 1985, the title was repealed, and no new title was substituted. For ease of reference, we now refer to the statute as the "Medical Malpractice Act."

prove the existence of a physician-patient relationship relates to the first element of negligence–i.e., whether the defendant-physician owed a duty of care to the plaintiff.

In a number of cases, this Court and the Court of Appeals have stated that a physician-patient relationship is an "essential" or "necessary" element of a medical malpractice action. See Pittman v. Upjohn Co., 890 S.W.2d 425, 431 (Tenn. 1994); Bradshaw v. Daniel, 854 S.W.2d 865, 870 (Tenn. 1993); Steele v. Berkman, No. M2001-02250-COA-R10-CV, 2002 WL 1800982, at *4 (Tenn. Ct. App. Aug. 7, 2002); Estate of Doe v. Vanderbilt Univ., Inc., 958 S.W.2d 117, 122 (Tenn. Ct. App. 1997); Bass v. Barksdale, 671 S.W.2d 476, 486 (Tenn. Ct. App. 1984); Dunbar v. Strimas, 632 S.W.2d 558, 562 (Tenn. Ct. App. 1981).[8] That relationship has been deemed "essential" because, as the Court of Appeals has stated, "[t]he existence of a physician's duty arises out of the professional relationship between the physician and his or her patient." Church v. Perales, 39 S.W.3d 149, 164 (Tenn. Ct. App. 2000), see also Darby v. Union Planters Nat. Bank of Memphis, 436 S.W.2d 439, 440-441 (Tenn. 1969) (stating, "[t]here is little doubt that the undertaking of a physician to diagnose and treat the ills of a patient is, in part, contractual in nature. The relationship thus arising between a physician and patient creates a duty on the part of the physician to exercise proper care.").

Under the foregoing cases, a physician's duty of care arises from the physician-patient relationship.[9] We next consider the circumstances under which such a relationship is established.

DETERMINING EXISTENCE OF PHYSICIAN-PATIENT RELATIONSHIP

Under the few Tennessee cases discussing the subject, "[t]he [physician-patient] relationship is generally characterized as a contractual one in which the patient knowingly and voluntarily seeks the professional assistance of the physician, and the physician knowingly agrees to treat the patient." Church, 39 S.W.3d at 164 (citing Jennings v. Case, 10 S.W.3d 625, 628 (Tenn. Ct. App. 1999) and Osborne, 425 S.W.2d at 771). The relationship may either be express or implied. Jennings, 10 S.W.3d at 628. A face-to-face meeting between the physician and patient is not required, and a physician-patient relationship therefore "may arise out of a consultation by the patient's primary physician with another physician when that consultation is for the treatment of the patient." Bass, 671 S.W.2d at 487.

While the Tennessee cases cited above mention that the physician-patient relationship is a

---

[8]The cases cited above trace back, directly or indirectly, to the Court of Appeals' decision in Osborne v. Frazor, 425 S.W.2d 768 (Tenn. Ct. App. 1968). In that case, the Court of Appeals briefly discussed the nature of the physician-patient relationship. However, as the plaintiff in the pending case correctly points out, the court in Osborne did *not* state (much less hold) that a physician-patient relationship is an essential element of a medical malpractice action. Although Osborne might have been cited incorrectly in the past as authority for the "essential element" principle, that principle is now well-established under the cases cited above.

[9]The plaintiff asserts that the existence of a physician-patient relationship should not be the only basis for finding that a physician owes a duty of care to a particular person. We will address that issue later in this opinion.

6

contractual one, it is clear that the question of whether a physician-patient relationship arises (for purposes of a medical malpractice action) is not governed solely by the law of contracts.[10] As Bass suggests, the physician-patient relationship can arise in situations in which a "contract" might not be found to exist under a strict application of contract principles. Our review of cases from other jurisdictions supports that conclusion.

In most jurisdictions in which the issue has been addressed, courts continue to require the plaintiff in a medical malpractice case to prove the existence of a physician-patient relationship, but most courts also state that such a relationship is implied *if* the physician affirmatively undertakes to diagnose and/or to treat the plaintiff. See, e.g., Oliver v. Brock, 342 So. 2d 1, 3-4 (Ala. 1976) (quoting 61 Am. Jur. 2d, *Physicians, Surgeons, and Other Healers* § 96[11] and stating, "'the voluntary acceptance of the physician-patient relationship by the affected parties creates a prima facie presumption of a contractual relationship between them. A physician may accept a patient and thereby incur the consequent duties although his services are performed gratuitously or at the solicitation and on the guaranty of a third person. . . .'"); Bovara v. St. Francis Hosp., 700 N.E.2d 143, 146 (Ill. App. Ct. 1998) (stating, "A consensual relationship can be found to exist where a physician contacts another physician on behalf of the patient or where a physician accepts a referral of a patient; the reasoning is that the consent of the patient to the service provided by the second physician is implied." (internal citations omitted)); Walters v. Rinker, 520 N.E.2d 468, 472 (Ind. Ct. App. 1988) (stating, "The important fact in determining whether the relationship is a consensual one, however, is not who contracted for the service but whether it was contracted for with the express or implied consent of the patient or for his benefit. . . . Where . . . healthcare services are rendered on behalf of the patient, and are done for the patient's benefit, a consensual physician-patient relationship exists for the purposes of medical malpractice."); Irvin v. Smith, 31 P.3d 934, 941 (Kan. 2001) ("A physician's indirect contact with a patient . . . does not preclude the finding of a physician-patient relationship. A physician-patient relationship may be found where a physician is contacted by someone on behalf of the patient. Indeed, an implied physician-patient relationship may be found where the physician gives advice to a patient by communicating the advice through another health care professional." (internal citations omitted)); Sterling v. Johns Hopkins Hosp., 802 A.2d 440, 455 (Md. Ct. Spec. App. 2002), *cert. denied*, 808 A.2d 808 (Md. 2002) (stating, "In the final analysis, we take it as well-settled that a physician-patient relationship may arise by implication where the doctor takes affirmative action to participate in the care and treatment of a patient."); Oja v. Kin, 581 N.W.2d 739, 743 (Mich. Ct. App. 1998) (stating that "merely listening to another physician's description of a patient's problem and offering a professional opinion regarding the

---

[10]We note that medical malpractice actions historically could be brought either as a contract action or a tort action. See, e.g., Bodne v. Austin, 2 S.W.2d 100 (Tenn. 1928) (indicating that medical malpractice actions could be brought "in contract or *ex delicto*," but holding that the one-year statute of limitations for actions "for injuries to the person" applied to medical malpractice actions, not the six-year statute of limitations applicable to "actions on contracts not otherwise provided for."). One may surmise that the oft-repeated statement–"a physician-patient relationship is an essential element of a medical malpractice case"–is a vestige of the historical roots of such actions.

[11]The citation in Oliver to "Am. Jur. 2d" is obsolete. For the relevant discussion in the current edition, see 61 Am. Jur. 2d, *Physicians, Surgeons, and Other Healers* § 130 (2002).

7

proper course of treatment is not enough" to create a physician-patient relationship, but a doctor who "receives a description of a patient's condition and then essentially directs the course of that patient's treatment, has consented to a physician-patient relationship."); Corbet v. McKinney, 980 S.W.2d 166, 169 (Mo. Ct. App. 1998) (stating, "The liability of a physician who is consulted on a case by a patient's treating or family physician generally depends on whether the physician undertakes to examine, diagnose, or treat the patient, or merely undertakes to advise the patient's treating physician as to general patient care. Thus, where the question is whether a physician-patient relationship has arisen between another doctor's patient and a physician consulted on the case, we look for these indicia of consent as well as other evidence of a consensual relation." (internal citation omitted)); Flynn v. Bausch, 469 N.W.2d 125, 128 (Neb. 1991) (stating, "While the relationship is often described as contractual in nature, based upon the express or implied consent of both physician and patient, we have held that absent fraud or misrepresentation, consent to medical treatment is presumed." (internal citations omitted)); Cogswell by Cogswell v. Chapman, 672 N.Y.S.2d 460, 462 (N.Y. App. Div. 1998) (stating, "a doctor-patient relationship can be established by a telephone call when such a call 'affirmatively advis[es] a prospective patient as to a course of treatment' and it is foreseeable that the patient would rely on the advice." (internal citation omitted)); Lownsbury v. VanBuren, 762 N.E.2d 354, 360 (Ohio 2002) (stating, "The basic underlying concept in these cases is that a physician-patient relationship, and thus a duty of care, may arise from whatever circumstances evince the physician's consent to act for the patient's medical benefit."); St. John v. Pope, 901 S.W.2d 420, 424 (Tex. 1995) ("Creation of the physician-patient relationship does not require the formalities of a contract. The fact that a physician does not deal directly with a patient does not necessarily preclude the existence of a physician-patient relationship.").

Two cases are particularly instructive in our consideration of the case under submission. The first case, Campbell v. Haber, 710 N.Y.S.2d 495 (N.Y. App. Div. 2000), is very similar to the pending case. In Campbell, the plaintiff presented at a hospital emergency room complaining of chest pains. After obtaining test results indicating that the patient might have sustained heart muscle damage, the emergency physician consulted the defendant-cardiologist by telephone. The emergency physician informed the cardiologist of the patient's symptoms and test results. The cardiologist opined that the test results were not consistent with a cardiac event. The emergency physician informed the patient and her husband that he had consulted with a cardiologist, who had opined that the symptoms were not caused by the plaintiff's heart. The emergency physician discharged the patient.[12] Under these facts, and because there was a "triable issue of fact whether [the cardiologist] was 'on call,'" the appellate court affirmed the trial court's denial of the defendant-cardiologist's motion for summary judgment. Id. at 496.

A second case, Blazo v. McLaren Reg'l Med. Ctr., 2002 WL 1065710 (Mich. Ct. App. May

_____

[12]The events that occurred after the patient's discharge are not summarized in the court's opinion. Presumably, she sustained a heart-related injury.

8

28, 2002), *appeal denied*, 656 N.W.2d 526 (Mich. 2003), also is similar to the pending case.[13] In Blazo, the plaintiff, who was pregnant at the time, went into contractions while she was at the hospital for carpal tunnel surgery. A hospital nurse called the office of the plaintiff's obstetrician, but the obstetrician was unavailable. The nurse spoke with another doctor in the office, who was "covering" for the plaintiff's obstetrician. After the nurse related the plaintiff's condition to the covering physician, the physician told the nurse that there were three options: to transfer the patient to another facility, or to admit her to the hospital overnight, or to discharge her until her pregnancy progressed further. The plaintiff alleged that the covering physician's advice violated the standard of care.[14] Relying on Oja, supra, and Hill v. Kokosky, 463 N.W.2d 265 (Mich. Ct. App. 1990), the covering physician argued that a physician-patient relationship did not arise. The Michigan Court of Appeals distinguished Hill, stating:

> the instant case does not involve a treating physician's solicitation of an informal opinion from another physician. Rather, viewing the facts in a light most favorable to plaintiff, a nurse called the patient's *treating* physician seeking *directions for care*, and was directed to the doctor who had *assumed the responsibility of covering* for the treating physician.

Blazo, 2002 WL 1065710, *2. The court also distinguished Oja on factual grounds. The court in Blazo went on to hold that there was evidence that the defendant physician "did something, such as participate in the plaintiff's diagnosis and treatment . . . that supports the implication that he consented to the physician-patient relationship. . . . This, coupled with evidence that [the defendant physician] . . . had assumed the responsibility of covering for plaintiff's treating obstetrician, created a question of fact regarding the existence of the physician-patient relationship." Id.

In light of the increasing complexity of the health care system, in which patients routinely are diagnosed by pathologists or radiologists or other consulting physicians who might not ever see the patient face-to-face, it is simply unrealistic to apply a narrow definition of the physician-patient relationship in determining whether such a relationship exists for purposes of a medical malpractice case.[15] Based upon the foregoing authorities, we hold that a physician-patient relationship may be implied when a physician affirmatively undertakes to diagnose and/or treat a person, or affirmatively participates in such diagnosis and/or treatment.

---

[13]Blazo is an unpublished opinion. While we rarely cite unpublished cases from other jurisdictions, unpublished opinions may be cited as persuasive authority. Tenn. S. Ct. R. 4(H)(1). Because the facts in Blazo are so analogous to the pending case, this is one of the rare instances in which we do so.

[14]Blazo does not state the injuries that resulted from the defendant's alleged violation of the standard of care. The opinion states that the plaintiff brought suit on behalf of her twins, so one may infer that the children sustained some type of injury.

[15]See e.g. Raptis-Smith v. St. Joseph's Med. Ctr., 755 N.Y.S.2d 384, 386 (N.Y. App. Div. 2003) (discussing physician-patient relationship between plaintiff and radiologist); Peterson v. St. Cloud Hosp. 460 N.W.2d 635, 638 (Minn. Ct. App. 1990) (discussing physician-patient relationship between plaintiff and pathologist).

The defendants, Dr. Cage and Mid-State, assert that they are entitled to summary judgment because, given the evidence in the summary judgment record, no genuine issue of material fact exists with regard to the existence of a physician-patient relationship and that they are entitled to a judgment as a matter of law. The record does not support the defendants' assertion.

As stated earlier, the applicable standard of review requires us to examine the evidence and to make all reasonable inferences therefrom in the light most favorable to the plaintiffs and to discard all countervailing evidence; moreover, our review is de novo, with no presumption of correctness. In the light most favorable to the plaintiffs, the opponents to the motion for summary judgment, the evidence establishes that Mrs. Kelley had suffered a heart attack on April 18, 1999, and was seen and treated by Dr. William Fleet, an associate of Dr. John Cage at Mid-State. The evidence also establishes that Dr. Anderson, the emergency room physician who treated Mrs. Kelley on June 10, 1999, placed a telephone call to Dr. Fleet for advice concerning Mrs. Kelley's treatment. When Dr. Anderson was unable to reach Dr. Fleet, he spoke instead with Dr. Cage, who was "covering" for Dr. Fleet.[16] Dr. Anderson informed Dr. Cage that Mrs. Kelley had presented to the emergency room with chest pain which she described as similar to that she experienced with her heart attack two months earlier. Dr. Cage inquired as to whether a cardiac catheterization had been performed and whether there had been any intervention. Dr. Anderson read "verbatim" the medical records detailing Mrs. Kelley's partially occluded left anterior descending artery and informed Dr. Cage that there had been no intervention. After Dr. Anderson provided detailed information concerning Mrs. Kelley's history and her present status based upon his examination and upon diagnostic tests, Dr. Anderson and Dr. Cage discussed how to treat Ms. Kelley's current chest pain. Dr. Cage concluded that Mrs. Kelley should be treated with medication and released with instructions to follow-up with her regular physician. Dr. Anderson followed this advice, releasing Mrs. Kelley from the hospital, and Mrs. Kelley died seven days later of heart failure.

The facts in the record present disputed issues as to the existence of a physician-patient relationship between Dr. Cage and Mrs. Kelley. In reaching that conclusion, we emphatically reject the defendants' assertion that the "undisputed facts" show that Dr. Cage's actions relating to Mrs. Kelley amounted to nothing more than a so-called "curbside consultation."[17] Under the applicable standard of review, the facts (as summarized above) do not involve a "curbside consultation." We express no opinion as to the issue of whether a duty of care might arise in a situation involving an

---

[16] "The medical profession recognizes that it is appropriate for physicians to arrange for other physicians to cover for them when they will be temporarily unavailable. Accordingly, the courts have held that when a physician is temporarily unable to attend a patient personally, he or she may make arrangements for a competent person to attend the patient in the physician's absence." Church, 39 S.W.3d at 164 (citations omitted).

[17] In their brief, the defendants use the term "curbside consultation" numerous times to describe Dr. Cage's actions relating to Mrs. Kelley. We presume from their use of the term that they mean a casual or informal conversation between physicians concerning one physician's patient. See Irvin, 31 P.3d at 943-44 (discussing "curbside consultations" and public policy considerations).

actual "curbside consultation."[18]

WHETHER DR. CAGE OWED DUTY OF CARE IRRESPECTIVE
OF PHYSICIAN-PATIENT RELATIONSHIP

The plaintiffs argue that Dr. Cage owed Mrs. Kelley a duty of care irrespective of whether there technically was a physician-patient relationship. The plaintiffs assert that medical malpractice cases are governed by the Medical Malpractice Act and that the Act does not explicitly require the plaintiff to prove the existence of a physician-patient relationship. The plaintiffs also argue that "the case of Diggs v. Arizona Cardiologists, Ltd. [8 P.3d 386 (Ariz. Ct. App. 2000)] provides the better reasoned view of liability of consulting physicians for their negligence which causes injury to, or death of, a patient."[19] See also Meena v. Wilburn, 603 So.2d 866 (Miss. 1992).[20]

We decline to address this issue because it was not raised below, either in the trial court or in the Court of Appeals. The only issue decided by the trial court was whether there are disputed issues of fact as to the existence of a physician-patient relationship. Accordingly, the "Diggs issue" asserted by the plaintiffs is not properly before the Court. See Tamco Supply v. Pollard, 37 S.W.3d 905, 909 (Tenn. Ct. App. 2000) (stating, "It is well settled in this state that a party on appeal will not be permitted to depart from the theory on which the case was tried in the lower court. Issues not raised or complained of in the trial court will not be considered on appeal."). We therefore leave that issue open for consideration in a future case in which the issue is properly raised.

---

[18]Likewise, we express no opinion as to the ultimate resolution of the other elements of the plaintiffs' medical malpractice action against Dr. Cage and Mid-State. Our holding is limited to the question of whether there are disputed issues of fact as to the existence of a physician-patient relationship between Dr. Cage and Mrs. Kelley.

[19]The facts in Diggs are very similar to those in the pending case. An emergency room physician discussed a patient's cardiac symptoms and test results with a cardiologist who happened to be visiting another patient in the Emergency Department. The cardiologist did not examine or otherwise see the patient, but he and the emergency physician discussed her history and the results of her physical examination, and he reviewed her EKG results. The cardiologist and the emergency physician agreed that the patient was suffering from pericarditis and that she should be treated with an anti-inflammatory medication and discharged with instructions to follow-up with her family practice physician. The patient was discharged and died three hours later of cardiopulmonary arrest. The Court of Appeals of Arizona rejected the approach taken by courts in most other jurisdictions, i.e., requiring the plaintiff to prove the existence of a physician-patient relationship. The Court of Appeals noted that such relationships often are "implied," but the Court of Appeals criticized the reliance on the contract-based physician-patient relationship. The Court stated that such issues must be resolved under the "traditional approach to duty," i.e., under the common law duty principles applied in negligence cases, and went on to hold that under those duty principles the defendant-cardiologist owed a duty of care to the patient.

[20]In Meena, the defendant-physician, who was covering for another doctor, negligently failed to identify the correct patient, one of two patients in a semi-private hospital room, and ordered his nurse to remove the surgical staples of the incorrect patient, who had just had surgery two days earlier, resulting in a reopening of the surgical wound and causing serious complications. The Supreme Court of Mississippi held that the covering physician could be sued for medical malpractice despite the absence of a physician-patient relationship between him and the incorrectly identified patient.

11

Because our holding results in the case being remanded for further proceedings, we deem it advisable to briefly discuss the question of how the existence of a physician-patient relationship is to be decided at trial. As stated earlier in this opinion, the issue of whether the defendants owed Mrs. Kelley a duty of care is a question of law to be determined by the court. However, in some cases the trial court's determination as to whether a duty exists (a question of law) is dependent upon a question of fact that must be decided by the jury. As the Supreme Court of Michigan has stated (in a non-medical malpractice context):

> It is commonplace to say that a particular defendant owes a duty to a particular plaintiff, but such a statement, although not incorrect, merges two distinct analytical steps. It is for the court to determine, as a matter of law, what characteristics must be present for a relationship to give rise to a duty the breach of which may result in tort liability. It is for the jury to determine whether the facts in evidence establish the elements of that relationship. Thus, the jury decides the question of duty only in the sense that it determines whether the proofs establish the elements of a relationship which the court has already concluded give rise to a duty as a matter of law.

Smith v. Allendale Mut. Ins. Co., 303 N.W.2d 702, 710 (Mich. 1981). In that regard, it is generally held in medical malpractice cases that the question of whether a physician-patient relationship exists is a question of fact to be decided by the jury. See, e.g., Irvin, 31 P.3d at 940-41 (stating that "whether a physician-patient relationship exists is generally a question of fact for the jury."); Bienz v. Central Suffolk Hosp., 557 N.Y.S.2d 139,139-40 (N.Y. App. Div. 1990) (stating, "Whether the physician's giving of advice furnishes a sufficient basis upon which to conclude that an implied physician-patient relationship had arisen is ordinarily a question of fact for the jury.).

We agree with the foregoing authorities that the existence of a physician-patient relationship is dependent upon the particular facts of the case, and that the issue therefore should be decided by the jury. As a result, on remand the trial court shall instruct the jury (in accordance with the principles discussed in this opinion) that the jury must determine from the facts in evidence whether such a relationship arose between Dr. Cage and Mrs. Kelley. The trial court also shall instruct the jury that, *if* the jury finds a physician-patient relationship *did* exist between Dr. Cage and Mrs. Kelley, Dr. Cage thereby owed a duty of care to her as a matter of law.

## CONCLUSION

The Court of Appeals correctly found that there are disputed issues of fact as to the existence of a physician-patient relationship and therefore reversed the trial court's summary judgment granted to Dr. Cage and Mid-State. We affirm the decision of the Court of Appeals and remand to the trial court for further proceedings consistent with this opinion.

The costs of this appeal are assessed against the defendants, John Cage, M.D., and Mid-State Cardiology Associates, P.C., for which execution may issue if necessary.


_____
WILLIAM M. BARKER, JUSTICE