James H. KELLEY, Surviving Spouse
of Lillie Donnette Kelley,
Deceased, et al.,

v.

MIDDLE TENNESSEE EMERGENCY
PHYSICIANS, P.C., et al.

Court of Appeals of Tennessee,
Middle Section, at Nashville.

Feb. 7, 2007 Session.

May 8, 2007.

Permission to Appeal Denied by
Supreme Court Sept. 17, 2007.

Daniel L. Clayton, Nashville, Tennessee, and Steven R. Walker, Memphis, Tennessee, for the appellants, James H. Kelley, Surviving Spouse of Lillie Donnette Kelley, Deceased; Joshlane Rachel Ware, Surviving Minor Daughter of Lillie Donnette Kelley, By and Through Her Next Friend, Jackie White; and Joseph Lovell Ware, Surviving Adult Child of Lillie Donnette Kelley, Deceased.

C.J. Gideon, Jr., and Brian Cummings, Nashville, Tennessee, for the appellees, John Cage, M.D., and Mid–State Cardiology Associates, P.C.

## OPINION

FRANK G. CLEMENT, JR., J.,
delivered the opinion of the court, in which WILLIAM C. KOCH, JR., P.J., M.S., and WILLIAM B. CAIN, J., joined.

The appeal arises from the summary dismissal of a medical malpractice action against a cardiologist and his cardiology group. The decedent's surviving family alleges the decedent's death was the result of medical malpractice. The trial court dismissed the claim finding the plaintiff failed to prove the element of causation as required by Tenn.Code Ann. § 29–26–115(a)(3). The plaintiff contends the evidence was sufficient to survive summary dismissal. Finding no error, we affirm.

Ms. Lillie Kelley, deceased, went to the emergency room at Baptist Hospital on April 18, 1999, complaining of chest pains that had progressively worsened. She was diagnosed as having a heart attack and was admitted to the hospital. During her

hospital stay, a cardiac catheterization performed by Dr. William Fleet, a cardiologist with Mid–State Cardiology Associates, revealed a blood clot in her left anterior descending artery. The doctors treated Ms. Kelley with anticoagulant medication and released her after four days in the hospital.

Approximately two months later, on June 10, 1999, Ms. Kelley returned to the emergency room at Baptist hospital complaining of chest pain similar to that which she experienced in April. Dr. John Anderson, an emergency physician, saw and treated Ms. Kelley. Dr. Anderson contacted Ms. Kelley's primary care physician, Dr. Thomas Patten, and also attempted to contact Dr. Fleet because of his treatment of Ms. Kelley's previous heart attack. Dr. Fleet was unavailable, and thus Dr. Anderson instead spoke to Dr. John Cage who was also an employee of Mid–State Cardiology Associates.

Dr. Anderson apprised Dr. Cage of Ms. Kelley's condition, including her medical history, complaints of atypical chest pain lasting over twelve hours, an unremarkable clinical exam, an absence of changes in her EKG, and a normal level of troponin I. Dr. Anderson also informed Dr. Cage that Ms. Kelley had the cardiac catheterization in April, which revealed the clogged artery but no other disease.

Based upon this information, Dr. Anderson and Dr. Cage agreed to treat Ms. Kelley symptomatically with follow-up care in the next couple of days with Dr. Patten. Ms. Kelley contacted Dr. Patten's office on June 11, 1999, regarding her trip to the emergency room and complaining of "charlie horses" in her legs for which Dr. Patten prescribed medication.

On June 14, 1999, Ms. Kelley visited Dr. Patten's office complaining that her heart was racing and she was experiencing mild chest discomfort, and she was sweating excessively. Dr. Patten performed an EKG, which was within the normal limits, and then instructed her to increase her anticoagulant medication and return to Dr. Fleet for further examination.

On June 16, 1999, Ms. Kelley was again experiencing chest discomfort. She called Dr. Patten's office but Dr. Patten was unavailable. In his absence she was directed to speak with Dr. Berkebile who, after consulting over the phone, instructed Ms. Kelley to go to the emergency room. Ms. Kelley told Dr. Berkebile that she would not go to the emergency room. As a consequence of her refusal to go to the emergency room, Dr. Berkebile instructed Ms. Kelley to come to her office for an examination; however, Ms. Kelley also refused to go to Dr. Berkebile's office. Upon Ms. Kelley's refusal to be seen by a doctor, Dr. Berkebile prescribed additional medication.

At approximately 9:45 a.m. on June 17, 1999, Ms. Kelley again called Dr. Patten's office with complaints of chest pain; however, Dr. Patten was unavailable when she called. Due to severe chest pain, Ms. Kelley then called "911" to request emergency assistance. An ambulance was immediately dispatched to her residence which transported Ms. Kelley to the emergency room at Baptist Hospital. She arrived at the hospital at 11:35 a.m. following which it was determined that Ms. Kelley was experiencing acute cardiopulmonary arrest. She went into a comatose state and after prolonged resuscitation attempts, Ms. Kelley was pronounced dead at 12:40 p.m.

Following her death, Ms. Kelley's surviving spouse and children (collectively "Plaintiffs") filed a wrongful death action against numerous healthcare defendants including Dr. Cage and his medical group, Mid–State Cardiology Associates (collectively "Defendants"). Defendants filed

Answers to the Complaint after which a substantial amount of discovery was taken. Thereafter, on November 14, 2005, Defendants filed a Motion for Summary Judgment wherein they asserted, *inter alia,* that nothing Dr. Cage did or allegedly failed to do on June 10, 1999, more likely than not caused Ms. Kelley's June 17, 1999 death or any injury that would not otherwise have occurred. In support of the motion, Defendants filed the deposition of Plaintiffs' only expert witness, Dr. Brodarick.

The Motion for Summary Judgment was heard on January 27, 2006. Two weeks later, the court issued an Order concluding that "the Plaintiff has failed to create a genuine issue of material fact on the causation element of the Plaintiffs' claims against Dr. Cage" because Dr. Brodarick, in his deposition, testified that he could not state that anything Dr. Cage did or allegedly failed to do on June 10, 1999, more likely than not caused the death of Ms. Kelley on June 17, 1999. This appeal followed.[1]

## STANDARD OF REVIEW

The issues were resolved in the trial court upon summary judgment. Summary judgments do not enjoy a presumption of correctness on appeal. *BellSouth Advertising & Publishing Co. v. Johnson,* 100 S.W.3d 202, 205 (Tenn.2003). This court must make a fresh determination that the requirements of Tenn. R. Civ. P. 56 have been satisfied. *Hunter v. Brown,* 955 S.W.2d 49, 50–51 (Tenn.1997). We consider the evidence in the light most favorable to the non-moving party and resolve all inferences in that party's favor. *Godfrey v. Ruiz,* 90 S.W.3d 692, 695 (Tenn.2002). When reviewing the evidence, we first determine whether factual disputes exist. If a factual dispute exists, we then determine whether the fact is material to the claim or defense upon which the summary judgment is predicated and whether the disputed fact creates a genuine issue for trial. *Byrd v. Hall,* 847 S.W.2d 208, 214 (Tenn. 1993); *Rutherford v. Polar Tank Trailer, Inc.,* 978 S.W.2d 102, 104 (Tenn.Ct.App. 1998).

Summary judgments are proper in virtually all civil cases that can be resolved on the basis of legal issues alone, *Byrd v. Hall,* 847 S.W.2d at 210; *Pendleton v. Mills,* 73 S.W.3d 115, 121 (Tenn.Ct.App. 2001); however, they are not appropriate when genuine disputes regarding material facts exist. Tenn. R. Civ. P. 56.04. The party seeking a summary judgment bears the burden of demonstrating that no genuine disputes of material fact exist and that the party is entitled to judgment as a matter of law. *Godfrey v. Ruiz,* 90 S.W.3d at 695. Summary judgment should be granted at the trial court level when the undisputed facts, and the inferences reasonably drawn from the undisputed facts, support one conclusion, which is the party seeking the summary judgment is entitled to a judgment as a matter of law. *Pero's Steak & Spaghetti House v. Lee,* 90 S.W.3d 614, 620 (Tenn.2002); *Webber v. State Farm Mutual Automobile Ins. Co.,* 49 S.W.3d 265, 269 (Tenn.2001). The court must take the strongest legitimate view of

---

1. This is the second appeal in this matter. In 2002, Defendants filed a motion for summary judgment asserting that no doctor-patient relationship existed between Dr. Cage and Ms. Kelley and, in the alternative, that Dr. Cage complied with the standard of care. The trial court granted the motion; however, this Court vacated the summary dismissal finding disputed issues of fact as to a physician-patient relationship, *see Kelley v. Cage,* No. 00C–1559, 2002 WL 1315536, at *1(Tenn.Ct.App. June 18, 2002), which decision the Supreme Court affirmed. *See Kelley v. Middle Tennessee Emergency Physicians P.C.,* 133 S.W.3d 587 (Tenn.2004).

the evidence in favor of the non-moving party, allow all reasonable inferences in favor of that party, discard all countervailing evidence, and, if there is a dispute as to any material fact or if there is any doubt as to the existence of a material fact, summary judgment cannot be granted. *Byrd v. Hall*, 847 S.W.2d at 210; *EVCO Corp. v. Ross*, 528 S.W.2d 20 (Tenn.1975). To be entitled to summary judgment, the moving party must affirmatively negate an essential element of the non-moving party's claim or establish an affirmative defense that conclusively defeats the non-moving party's claim. *Cherry v. Williams*, 36 S.W.3d 78, 82–83 (Tenn.Ct.App.2000).

## ANALYSIS

This action is governed by the Medical Malpractice Act (the "Act"). Tenn.Code Ann. § 29–26–115 (2006). Thus, our review of whether summary judgment was appropriate begins with an examination of the Act. *See Kilpatrick v. Bryant*, 868 S.W.2d 594, 597 (Tenn.1993).

The plaintiff in a medical malpractice action has the burden of proving by expert testimony the following three elements:

(1) The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which the defendant practices or in a similar community at the time the alleged injury or wrongful action occurred;

(2) That the defendant acted with less than or failed to act with ordinary and

reasonable care in accordance with such standard; and

(3) As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.

Tenn.Code Ann. § 29–26–115(a). A claim cannot succeed in the absence of any one of these elements. *Kelley v. Middle Tennessee Emergency Physicians, P.C.*, 133 S.W.3d 587, 592 (Tenn.2004) (citing *Bradshaw v. Daniel*, 854 S.W.2d 865, 869 (Tenn. 1993)). Accordingly, Plaintiffs must prove all three elements. Moreover, as the Act requires, the facts of the requisite elements must be proved by competent expert testimony from a licensed health care professional. Tenn.Code Ann. § 29–26–115(b).[2]

The focus of the Motion for Summary Judgment and this appeal is the third element, which requires a causal connection between the defendant's act or omission and the plaintiff's injuries. *See* Tenn.Code Ann. § 29–26–115(a)(3). Proximate cause, or legal cause, must be proven by a preponderance of the evidence. *Administrative Resources, Inc. v. Barrow Group, LLC*, 210 S.W.3d 545, 555 (Tenn.Ct.App. 2006) (citing *Kilpatrick*, 868 S.W.2d at 598). Neither the statute nor the common law require that the plaintiff prove legal cause with a level of absolute medical certainty. *See Pullum v. Robinette*, 174 S.W.3d 124, 141 (Tenn.Ct.App.2004); *see also Meek v. HealthSouth Rehabilitation Center of Clarksville*, No. M2005–00920–COA–R3–CV, 2006 WL 2106001 at *3 (Tenn.Ct.App. March 17, 2006). However,

---

**2.** No person in a health care profession requiring licensure under the laws of this state shall be competent to testify in any court of law to establish the facts required to be established by subsection (a), unless the person was licensed to practice in the state or a contiguous bordering state a profession or specialty which would make the person's expert testimony relevant to the issues in the case and had practiced this profession or specialty in one (1) of these states during the year preceding the date that the alleged injury or wrongful act occurred. This rule shall apply to expert witnesses testifying for the defendant as rebuttal witnesses. Tenn.Code Ann. § 29–26–115(b).

the plaintiff must establish "it is more likely than not that the defendant's negligence caused plaintiff to suffer injuries which would have not otherwise occurred." *Boburka v. Adcock,* 979 F.2d 424, 429 (6th Cir.1992); *see also Pullum,* 174 S.W.3d at 141; *Church v. Perales,* 39 S.W.3d 149, 166 n. 20 (Tenn.Ct.App.2000). Therefore, this Court must consider whether Plaintiffs presented sufficient evidence to show that it is more likely than not that Dr. Cage's treatment, or lack thereof, caused Ms. Kelley's death or injuries that would not otherwise have occurred.

Plaintiffs contend they have provided sufficient expert testimony to satisfy the element of causation. To the contrary, Defendants assert Dr. Brodarick's testimony was insufficient to prove the causation element and therefore Plaintiffs failed to create a genuine issue of material fact. We conclude, as the trial court did, that Dr. Brodarick's deposition testimony does not establish that any alleged negligence by Dr. Cage more likely than not caused Ms. Kelley's death.

Our analysis begins with the determination of whether the Plaintiffs' sole expert witness, Dr. Brodarick, provided the requisite testimony to create a genuine issue of material fact sufficient to survive a motion for summary judgment on the issue of causation. The relevant portion of Dr. Brodarick's testimony is as follows:

Q. What do you know about Ms. Kelley's conversations with Dr. Berkebile for her office staff on June 16th, 1999, the day before her death?

A. I believe Dr. Berkebile suggested she go to the hospital when she reported chest discomfort.

Q. Of course Ms. Kelley didn't do that, we know that, right?

A. Right.

Q. If Ms. Kelley had gone to the hospital on June 16th, 1999, do you believe she would have died the next day?

A. No.

Q. Why not?

A. I think the appropriate intervention would have taken place. More likely than not a cardiac catheterization.

Q. *So to make this clear, you believe more likely than not if Ms. Kelley had gone to the hospital on June 16th, 1999 per Dr. Berkebile's request or instruction, she would not have died the next day?*

A. *Yes.*

Q. *Okay. Do you also believe that something Dr. Cage did or didn't do on June 10th, six days earlier, more likely than not caused her death on the 17th?*

A. *Well, the way things evolved then, no, because she survived that period of time.* (emphasis added).

In order for Plaintiffs' action to survive, it was essential they introduce competent expert testimony that Ms. Kelley's death was caused, more likely than not, from Dr. Cage's actions or inactions. Ironically, the expert testimony upon which Plaintiffs rely states the opposite. The relevant and unequivocal fact established by Plaintiffs' expert and Defendants' experts are that Dr. Cage's actions or inactions on June 10, 1999, did not more likely than not cause Ms. Kelley's death. Moreover, in Dr. Brodarick's opinion, Ms. Kelley had a better than fifty percent chance of survival on June 17, 1999, had she gone to the hospital on June 16 pursuant to Dr. Berkebile's instructions.

We acknowledge the additional argument of Plaintiffs that Dr. Cage breached the standard of care by not admitting Ms. Kelley to the hospital on June 10, 1999. This argument arises from the fact that

Dr. Cage was advised by Dr. Anderson when he called Dr. Cage that day to consult, that Ms. Kelley said she felt like she did when she had the myocardial infarction two months earlier. This fact, Plaintiffs assert, when considered with the testimony of Dr. Brodarick, established a duty upon Dr. Cage to admit Ms. Kelley to the hospital on June 10, which duty they contend Dr. Cage breached. Accepting this evidence in the light most favorable to Plaintiffs, and assuming *arguendo* that Plaintiffs presented adequate proof to establish these essential elements, Plaintiffs nevertheless failed to present competent medical proof that Dr. Cage's acts or omissions more likely than not caused Ms. Kelley's death. As we noted earlier, Dr. Brodarick testified that Ms. Kelley had a better than fifty percent chance of survival on June 17, 1999, had she gone to the hospital on June 16 pursuant to Dr. Berkebile's instructions. Thus, Plaintiffs failed to prove an essential element of a claim for medical malpractice.

The sole claim of liability against Mid–State Cardiology Associates, P.C. was based on the principle of vicarious liability for the negligence of Dr. Cage. The dismissal of the claim against Dr. Cage, therefore, necessitates the dismissal of the claim against Mid–State Cardiology Associates, P.C. For the reasons stated above, we affirm the summary dismissal of the action against Dr. Cage and Mid–State Cardiology Associates, P.C.[3]

### In Conclusion

The judgment of the trial court is affirmed, with costs of appeal assessed against Plaintiffs.

---

**3.** Our ruling on this issue renders moot the other issues.