**Jeffrey Scott TEDDER, a minor b/n/f Rauline Tedder and Rauline Tedder, Plaintiffs-Appellants,**

**v.**

**Edwin B. RASKIN, Trustee, Edwin B. Raskin Company d/b/a Fawnwood Apartments, Defendants-Appellees.**

Court of Appeals of Tennessee, Middle Section, at Nashville.

Jan. 29, 1987.

Application for Permission to Appeal Denied by Supreme Court March 30, 1987.

Dennis L. Tomlin, Nashville, for plaintiffs-appellants.

Douglas Fisher, Howell, Fisher, Branham & North, Nashville, for defendants-appellees.

## OPINION

CANTRELL, Judge.

The plaintiffs appeal from the trial court's grant of a directed verdict for the defendants at the close of the plaintiffs' proof in a jury trial. This case involves the increasingly common question of a landlord's liability to tenants for criminal acts by third parties on the leased premises, a question on which Tennessee law is unclear at this time.

The defendants owned and operated the Fawnwood Apartments in which the plaintiffs, Mrs. Tedder and her son, Scotty, resided in January 1982. In the early-morning hours of January 27, 1982, a bullet came through the wall of Scotty's bedroom, went through the headboard of his bed, and penetrated his skull as he lay in bed asleep. The bullet had been fired in the apartment next door during a struggle between the next-door neighbor and a man who was attempting to rob him.

Four or five months prior to the shooting, in August or September, 1981, Mrs. Tedder and a friend, Mr. Charles Moffitt, had complained to the apartment manager about the number of people in and out of the apartment next door. They told the manager that five or six carloads of people would come, stay a few minutes, and leave all day long, with the result that Mrs. Tedder and her friend could never find a parking place near her apartment. Mr. Moffitt testified that he told the manager he thought they must be selling drugs, to which the manager replied that they were just good old boys who had a lot of friends and they weren't causing any trouble. The manager asked Mrs. Tedder if she wanted her to speak to the neighbor about the parking problem, and Mrs. Tedder said yes.

A few days before the shooting in January, Mr. Moffitt again complained to the manager about the parking problem. He testified in part as follows:

> I told the lady traffic picked up considerably and I said it's getting dangerous up there. I think something is going to happen; somebody is going to start shooting. Bullets are going to be coming through the wall. She said to me, that's ridiculous. All they have is a bunch of friends.

Mr. Moffitt also testified that he pointed out five cars in the parking spaces in front of Mrs. Tedder's apartment, which the manager could see from the office.

Mrs. Tedder stated that when she leased the apartment, she was under the impression that the landlord provided twenty-four-hour security for the complex. Although the lessor did not mention security at the time Mrs. Tedder entered into the lease and she admitted that she did not ask about security, she asserts that she was present when her daughter leased an apartment in the same complex a few months earlier and heard a manager state that they provided twenty-four-hour-a-day security. She therefore felt it unnecessary to ask about security before leasing the apartment.

The plaintiffs sued the owner and operator of the apartment complex alleging negligence, breach of contract, and misrepresentation. In the negligence count they claim the defendants breached a duty to provide them a reasonably safe place to live by failing to protect them from dangers inherent in living next door to an alleged drug dealer. In the breach of contract and misrepresentation counts the plaintiffs allege that the defendants are liable for damages resulting from the breach of a contract to provide twenty-four-hour security, or in the alternative, for damages resulting from the defendants' misrepresentation concerning security.

To determine whether the trial judge erred in granting the defendants a directed verdict, we must consider each of the counts separately. In ruling on a motion for a directed verdict by the defendant, the trial judge must take the strongest legitimate view of the evidence and allow all reasonable inferences in favor of the plaintiff, disregarding any evidence to the contrary. *Benson v. H.G. Hill Stores, Inc.,* 699 S.W.2d 560 (Tenn.App.1985). To avoid a directed verdict, the plaintiff, having the burden of proof, must present some material evidence on each element of the cause of action asserted. *Id.* The evidence presented must be of sufficient substance to support a verdict for the plaintiff. *Id.* If the defendant prevails on the motion for a directed verdict, the trial judge must have determined that the defendant would prevail as a matter of law, even viewing the evidence in a light most favorable to the plaintiff. *Royal v. Days Inn of America, Inc.,* 708 S.W.2d 411 (Tenn.App.1985). We must now determine whether the trial court erred in finding that the plaintiff failed to present evidence sufficient for a prima facie showing of negligence, breach of contract, or misrepresentation.

## NEGLIGENCE

At early common law, a lease was viewed as a conveyance of an estate in land by the landlord to the tenant. The tenant received exclusive possession of the land and assumed all responsibilities related to the land, including maintenance and repairs, while the landlord simply collected the rent. This arrangement worked well in the agrarian economy of feudal England, where the existence or condition of a dwelling was incidental to the lease of the land for agricultural purposes. *Landlord Liability for Crimes Committed by Third Parties Against Tenants on the Premises,* 38 Vand.L.Rev. 431, 433 (1985).

As urban communities grew, the common law recognized the essential differences between the lease of urban dwelling units and the lease of land for agricultural purposes, and the law evolved to better fit these changed circumstances. Courts in the United States began to impose liability on landlords for negligence resulting in injuries to their tenants in certain situations, such as where the landlord had promised to make repairs and failed to do so or did so negligently, where a latent defect

existed in the land, where the land was leased for public use, or where the landlord retained control over part of the premises. *Id.* at 434–35.

Similarly, the evolving common law began to impose special duties on certain providers of public services, such as innkeepers and common carriers. The heightened standard of care for innkeepers was based largely on the fact that the innkeeper was in a superior position to take precautions for the safety of the guests since he retained control over the common areas of the inn. In addition, since the guest's "lease" of a room was only temporary, the landlord could not expect the "tenant" to repair and maintain the premises. These special circumstances led to the development of a special body of law governing the liability of innkeepers to their guests. *Id.*, at 436.

One exception to the general rule at common law was the imposition of liability on the innkeeper for nonfeasance, or the failure to take steps to protect the guests from harm, as well as misfeasance, or "active misconduct causing positive injury to others." *Cornpropst v. Sloan,* 528 S.W.2d 188 (Tenn.1975). Eventually liability for nonfeasance was extended by some courts to include the failure to take steps to protect another from harm caused by criminal acts of third parties. Liability for nonfeasance was limited, however, to special relationships involving special conditions and circumstances, like the relationships of innkeeper-guest and common carrier-passenger. *Id.*

Recognizing the similarity between innkeepers and modern landlords of urban apartment buildings, some courts in other states began to impose a heightened standard of care on this category of landlord. Of particular interest here is the imposition of a duty on landlords of apartment buildings, and liability for negligent breach of that duty, to take reasonable precautions to protect their tenants from criminal acts of third parties on the leased premises. Since the landlord retains control over the common areas of the apartment building and grounds, the landlord is in a far superior position to take steps necessary to secure the premises for the safety of the tenants. Like guests at inns, tenants in multiple-apartment buildings whose leases are often of short duration cannot be expected individually to make the expenditures necessary to secure the common areas of the building, for example by installing locks on outside entrances, providing adequate lighting in hallways, and taking similar precautions. The landlord, on the other hand, is in a better position to provide reasonable security and spread the cost among the tenants. The imposition by law of a duty on the landlord to take reasonable steps to secure the leased premises for the safety of the tenants was thus merely a logical extension of the existing common law governing the special relationship of innkeeper-guest.

▮ The development of the common law of landlord liability in Tennessee paralleled the evolution of the common law of other states in many respects. As a general rule, the landlord is not liable for injuries to the tenant caused by dangerous or defective conditions on the leased premises unless the landlord knew or in the exercise of reasonable care and diligence should have known of the dangerous condition at the time he leased the premises. *Roberts v. Tennessee Wesleyan College,* 60 Tenn. App. 624, 450 S.W.2d 21 (1969), *Bishop v. Botto,* 16 Tenn.App. 178, 65 S.W.2d 834 (1932). The Tennessee landlord is under a duty to turn over to the tenant a reasonably safe place to live or work, a duty which is imposed by law because of the special relationship of the parties. *Campbell v. Francis,* 53 Tenn.App. 80, 378 S.W.2d 790 (1964). However, the landlord is not liable in tort for injuries from defects in areas possessed by the tenant arising after the delivery of possession to the tenant. *Wilcox v. Hines,* 100 Tenn. 538, 46 S.W. 297 (1898), *Diamond v. Drew,* 17 Tenn.App. 488, 68 S.W.2d 955 (1933).

▮ By contrast, where the landlord retains possession of a part of the premises for use in common by different tenants, the landlord is under a continuing duty imposed by law to exercise reasonable care to

keep the common areas in good repair and safe condition. *Woods v. Forest Hill Cemetery,* 183 Tenn. 413, 192 S.W.2d 987 (1946), *Buggs v. Memphis Housing Authority,* 60 Tenn.App. 668, 450 S.W.2d 596 (1969). While this duty does not require constant care and inspection by the landlord, when he has actual or constructive notice of a dangerous or defective condition in an area under his control, he must act within a reasonable time to remedy the condition. *Jolly Motor Livery Corp. v. Allenberg,* 188 Tenn. 452, 221 S.W.2d 513 (1949). Liability does not ensue until the landlord has notice, actual or constructive, and a reasonable opportunity to repair the defect. *Glassman v. Martin,* 196 Tenn. 595, 269 S.W.2d 908 (1954). The defenses of contributory negligence and assumption of risk are also available to the landlord, if the tenant is injured by a dangerous condition readily apparent or reasonably discoverable. *Wilcox v. Hines,* 100 Tenn. 538, 46 S.W. 297 (1898), *Hamilton v. Moore,* 14 Tenn.App. 584 (1932). Thus, although the landlord is by no means an insurer of his tenants' safety, Tennessee common law has long held the landlord responsible for the condition of common areas under his control.

Although there are no reported Tennessee cases on the question of a landlord's liability for injuries resulting from criminal acts of third parties on the leased premises, we do not believe the landlord should be absolved of all liability for such injuries on the basis that he is under no duty whatsoever to take any precautions for the safety of his tenants. Such simple measures as providing adequate lighting in hallways and locks on outside entrances are peculiarly within the landlord's capability and could substantially reduce the risk of harm to his tenants. Under these circumstances, to hold the landlord unaccountable for injuries proximately caused by the condition of the common areas would be unconscionable.

■ Given the reasons behind the historical development of the common law in this area and the similarity between the special relationships and circumstances of the innkeeper and the modern landlord of a multi-ple-apartment building, we believe the same standard of care should apply to both the innkeeper and the landlord in the area of liability for injuries to tenants resulting from third-party crimes on the premises. In *Zang v. Leonard,* 643 S.W.2d 657, 663 (Tenn.App.1982), this court adopted the following standard for innkeepers:

> The measure of the liability of the possessor of land to invitees is *due care under all the circumstances* including the nature and use of the land, the nature of the invitation, the nature of the relationship with the invitee, the opportunity of the possessor and the invitee to know and avoid existing or probable dangers, and any and all other factors which would challenge the attention of the possessor and/or invitee to the probability of danger to the invitee and produce the precautions which a reasonably prudent person would instigate under the same or similar circumstances. (Emphasis added).

In other words, ordinary negligence principles apply. The landlord is not an insurer of his tenants' safety, but he can be held liable "where the injury of the guest [tenant] by the third party was made possible by the failure of the innkeeper [landlord] to exercise reasonable care under the circumstances." *Zang, supra,* at 664.

■ We do not perceive this extension of the common law as placing an undue burden on landlords. As in other negligence actions, the plaintiff will have to prove that the landlord was on notice of an unreasonable risk or likelihood of danger to his tenants caused by a condition within his control. Once notice sufficient to cause a reasonably prudent person to foresee the probability of harm is received, the duty to act arises and the failure to take reasonable steps to correct the problem within a reasonable time is a breach of that duty.

■ However, the plaintiff must further prove that the landlord's failure to act was the proximate cause of the injury. To meet this burden, the plaintiff must show that the injury was a reasonably foreseeable probability, not just a remote possibility, and that some action within the landlord's

power more probably than not would have prevented the injury. As we said in *Nashville C. & St.L. Ry. v. Harrell*, 21 Tenn. App. 353, 110 S.W.2d 1032 at 1038, 1039 (1937):

... Assuming the negligence of defendant there could be no recovery if the injury was one which could not have been foreseen nor reasonably anticipated as the probable result of defendant's negligence.... A long series of judicial decisions has defined proximate, or immediate and direct damages to be the ordinary and natural results of the negligence, such as are usual and might therefore have been expected; and this includes in the category of remote damages such as are the result of an accidental or unusual combination of circumstances which would not be reasonably anticipated, and over which the negligent party has no control.

If the injury was not reasonably foreseeable, then the criminal act of the third party would be a superceding, intervening cause of the harm, relieving the landlord of liability.

As the Supreme Court noted in *Cornpropst v. Sloan*, 528 S.W.2d 188 (Tenn. 1975), many difficult questions must be resolved in this type of negligence action. However, difficulty of analysis is no justification for denying a plaintiff recovery where the acts or omissions of the landlord proximately caused the plaintiff's injuries. Under the standard we have adopted, due care under all the circumstances, the fact finder must resolve these difficult questions on a case-by-case basis. As in other negligence cases, ordinarily ...

issues of proximate cause, intervening cause and contributory negligence are peculiarly issues for the trier of fact, not the court to determine. Such issues can only be decided by the court in cases where inferences from uncontroverted facts are so certain that all reasonable men, in the exercise of a free and impartial judgment, must agree upon.

*Brookins v. The Round Table, Inc.*, 624 S.W.2d 547 (Tenn.1981).

If, as a matter of law, the plaintiff has failed to allege or prove facts sufficient to establish notice, the existence of the duty to act, breach of the duty, or proximate cause, dismissal, summary judgment, or a directed verdict would be appropriate. Ordinarily, however, as in most negligence cases, these issues are for the jury's determination. Although admittedly questions such as what facts are sufficient to constitute notice, when the duty to act arises, what acts will discharge the duty, when the failure to act is the proximate cause of the injury, and similar questions are difficult to resolve, the sense of the jury is daily entrusted with the resolution of these and other difficult questions in our legal system. We believe the collective sense of the jury is equal to the task.

Having established the standard of care applicable in this case, we turn now to the question of whether the plaintiffs presented evidence sufficient to avoid a directed verdict for the defendants. The plaintiff in a negligence case must offer some material evidence showing the existence of a duty and an injury proximately caused by a breach of that duty. *Benson v. H.G. Hill Stores, Inc.*, 699 S.W.2d 560 (Tenn.App. 1985). As this court stated in *Benson, supra*, at 563:

Before an owner or operator of a premises can be held liable for negligence in allowing a dangerous or defective condition to exist on the premises, it must have been created by the owner or operator or his agent or, if the condition was created by someone else, there must be actual or constructive notice on the part of the owner or operator that the condition existed prior to the injury. *Jones v. Zayre, Inc.*, Tenn.App. 1980, 600 S.W.2d 730, and authorities cited therein.

In the instant case, the plaintiffs presented evidence that on two occasions Mrs. Tedder and Mr. Moffitt complained to the apartment manager about their problem of finding a parking place due to the large number of people visiting the next door neighbor. Mr. Moffitt told the manager that he thought the neighbor must be dealing drugs based solely on the number of visitors and the brevity of their stay. Al-

though the plaintiffs presented testimony of one witness who claimed to have dealt drugs with the neighbor, at the time the complaints about the parking problem were made to the manager, neither Mrs. Tedder nor Mr. Moffitt had any proof whatsoever that the neighbor was in fact dealing drugs.

Mr. Moffitt testified that the first complaint to the manager about the parking problem was made in August or September, 1981. The manager told Mrs. Tedder that she would speak to the neighbor about the parking situation, and there is no evidence in the record to show that she did not fulfill this promise. The second complaint was lodged four or five months later, only a few days before the shooting. Again, the thrust of the complaint was the parking problem, coupled with the uncorroborated suspicion of Mr. Moffitt that the neighbor was dealing in drugs.

█ Notice of a parking problem and the mere uncorroborated suspicion of illegal activity is not sufficient, as a matter of law, to give notice of a dangerous condition triggering the duty of the landlord to act. There is no evidence in the record to indicate that the defendants had actual knowledge or notice of drug dealing by the neighbor. If we held that the unsubstantiated suspicion of one tenant in a multiple-apartment building is sufficient to give constructive notice of illegal activity, the landlord would be placed in the impossible position of being forced to act as a private law enforcement agency upon such "notice". Any tenant would have a potent weapon to be used against any other tenant with whom she has a dispute or whom she just dislikes. Such a holding is untenable.

Furthermore, the criminal acts alleged in this case did not occur in the parking lot or a common area over which the landlord exercised control, but rather inside the apartment of another tenant with a reasonable expectation of privacy. The landlord's very ability to act would be circumscribed by the terms of that tenant's lease, which is not in the record. Even though most leases would probably allow the landlord to evict a tenant for conducting criminal activities on the premises, we do not believe the mere suspicion of one tenant of illegal activity by another would be sufficient ground for exercising this power. Such a suspicion would certainly not provide probable cause for the police to search the apartment or arrest the neighbor. Assuming the manager did speak to the neighbors about the parking problem as she promised to do after the first complaint, it is difficult to imagine what more a reasonable landlord could have done under the circumstances. Since the plaintiff did not complain again until four or five months later, the landlord could reasonably have assumed, until the second complaint, that the problem had been resolved. The second complaint was lodged only a few days before the shooting. Even if the landlord had been given enough information to exercise his right to evict the neighbor, which he again was not, the shooting would have occurred before he completed the eviction process. Since the landlord must be given a reasonable time in which to act, he could not have been held liable for the plaintiff's injuries.

█ Assuming *arguendo* that the "notice" given in this case was legally sufficient to trigger the duty of the landlord to act, the plaintiffs must still produce some material evidence that the negligence of the landlord in not acting was the proximate cause of the injury, or that the injury was a reasonably foreseeable and probable result of the landlord's negligence. Even assuming that the landlord actually knew the neighbor was dealing in drugs, we do not believe that a bullet fired during a struggle with a burglar going through a wall and injuring a person in the apartment next door is a probable, ordinary, natural, or usual result of drug dealing. There is no evidence in the record, statistical or otherwise, from which we could infer that such a result is the ordinary or usual consequence of drug dealing. We are not prepared to take the leap of faith required to reach such a conclusion. As the Supreme Court stated in *Ward v. The University of the South*, 209 Tenn. 412, 354 S.W.2d 246, 250 (1962):

"The test of liability under the law of intervening cause requires a person to anticipate or foresee what usually will happen. It does not require him to anticipate and provide against what is unusual or unlikely to happen, or that which is remotely possible, but whether it was probable according to the usual experience of persons." (Citations omitted.)

In the instant case, we believe the attempted burglary by a third party was an unusual, unlikely, or remotely possible result (if a result at all) of the drug dealing, and was thus an intervening, superceding cause of the plaintiffs' injuries, relieving the defendants of liability for negligence. We affirm the trial court's grant of a directed verdict for the defendants on the issue of negligence.

## BREACH OF CONTRACT AND MISREPRESENTATION

The plaintiffs also allege that the defendants' breach of a contract to provide "twenty-four hour security", or in the alternative their misrepresentations regarding security, resulted in the injuries they sustained. However, the plaintiffs have failed to present evidence sufficient to show that a contract even existed, or if a contract did exist, that the defendants breached the contract and that the breach proximately caused the injuries.

Mrs. Tedder testified that she did not discuss security with the defendants' agent before signing her lease. Since the lease is not in the record we cannot examine its provisions regarding security. "Twenty-four hour security" is not defined in the newsletter the plaintiffs introduced into evidence, and there is no evidence that the parties ever had a meeting of the minds on what that term meant. The plaintiffs apparently thought the term meant that a guard patrolled twenty-four hours a day, but in fact the guard patrolled only two hours each day and was on call the rest of the day and night. The term "twenty-four hour security" encompasses both of these interpretations.

To prevail on a cause of action based on misrepresentation, the plaintiff must show that the representation is false. *Hamilton v. Galbraith*, 15 Tenn.App. 158 (1932). The plaintiffs have failed to show that any representation regarding security was false, for they have failed to show that the defendants made any representation regarding security at the time the plaintiff entered the lease or that the parties agreed on what the term "twenty-four hour security" meant. Therefore, the trial court correctly granted the defendants a directed verdict on the misrepresentation count.

Leaving aside the above problems regarding the existence of a contract and the questions of consideration, integration, and the effect of the parol evidence rule, again there is no evidence in the record to show that the alleged breach of contract or misrepresentations proximately caused the plaintiffs' damages. The plaintiffs base these claims on the fact that the security guard only patrolled the complex approximately two hours per night and was on call the rest of the day and night. However, even if the guard actually patrolled twenty-four hours a day, he could not have stayed just outside the plaintiffs' apartment the entire time. There is nothing in the record to indicate the size or layout of the apartment complex, or the probability that the guard would have seen the burglar if he had been on patrol at the time of the break-in and shooting. Indeed, there is no evidence to show that he was not on patrol at the time of the shooting. Thus, there is no evidence from which the jury could infer that the absence of the guard proximately caused the shooting.

The plaintiffs attempt to rely on the testimony of the neighbor that he looked to see if the security guard was around before he engaged in any illegal activities. However, the question here is whether the burglar, not the neighbor, would more probably than not have been deterred by a twenty-four hour security patrol. No evidence was presented on this question.

Furthermore, as we stated in *Zang, supra*, at 665:

Human behavior is hardly predictable, even by the actor, himself. He may testify whether he would have been influenced by certain circumstances, but this is a far cry from stating what behavior would have occurred if a particular circumstance existed. Moreover, the issue is not whether the attacker would or would not have attacked, but what could and should have been anticipated by defendants.

The plaintiffs have failed to show that the injury which occurred was a reasonably foreseeable consequence of the failure of the landlord to provide a twenty-four hour security patrol. There is no evidence in the record to indicate that similar crimes had been a problem in the complex before this shooting, or that the complex was located in a high-crime area, circumstances which would be relevant in the determination of foreseeability. In short, the plaintiffs have not shown that the breach of contract (if there was a contract) proximately caused their injuries. Since the plaintiffs failed to carry their initial burden of proof, the defendants were entitled to a directed verdict on the breach of contract count.

For the reasons set forth above, the judgment of the court below is affirmed and the cause is remanded to the Third Circuit Court of Davidson County for any further proceedings necessary. Tax the costs on appeal to the appellants.

TODD, P.J., M.S., and KOCH, J., concur.