IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
October 23, 2007 Session

**DANIEL PANTOJA GARCIA v. NORFOLK SOUTHERN RAILWAY COMPANY**

**Appeal from the Circuit Court for Hamilton County**
**No. 02C1949     Jeffery Hollingsworth, Judge**

**No. E2006-02674-COA-R3-CV  - FILED FEBRUARY 22, 2008**

In this appeal of a directed verdict in a wrongful death case, Daniel Pantoja Garcia ("Husband") claims that Norfolk Southern Railway Company ("Norfolk Southern") was negligent in failing to warn his now-deceased wife, Lydia Garcia ("Wife"), of the presence of diesel fuel inside a fuel tank that Wife, as an employee of Progress Rail Services Corporation ("Progress Rail"), was assigned to dismantle. As Wife was cutting the tank with a torch-cutter on Norfolk Southern's property, the tank exploded, killing Wife. The trial court granted a directed verdict because it found no evidence that Norfolk Southern owed any duty in this case. We affirm.

**Tenn R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and D. MICHAEL SWINEY, J., joined.

Michael M. Raulston, Chattanooga, Tennessee, for the appellant, Daniel Pantoja Garcia, individually and as the surviving spouse of Lydia Garcia, deceased, and as father and next friend of Ismael Corona Garcia, Manuel Corona Garcia, and Daniel Corona Garcia, minor children of Lydia Garcia, deceased.

Craig R. Allen, Thomas A. Williams, and Bruce D. Gill, Chattanooga, Tennessee, for the appellee, Norfolk Southern Railway Company.

**OPINION**

## I.

As an initial matter, we note a procedural oddity in this case: although Norfolk Southern's motion for directed verdict was made immediately following the presentation of Husband's proof-in-chief, the parties agreed to finish a full day of testimony instead of immediately arguing the motion. Thus, three defense witnesses testified after the motion was made.[1] At least one additional Norfolk Southern witness was scheduled to testify the following day, but the court granted the motion and, hence, no further defense testimony was presented. Because the motion was not granted at the conclusion of *all* the proof, we would normally treat it as if it had been granted at the conclusion of the plaintiff's proof, and disregard all evidence that was offered after the plaintiff rested. However, in this case – for the reasons we are about to discuss – we have concluded that it is more appropriate to consider all the evidence presented before the motion was heard and decided.

In explaining its decision to grant a directed verdict, the trial court appears to have relied, in part, upon Norfolk Southern's evidence, and Husband did not object to this at trial. Nor does Husband raise an issue regarding the consideration of this evidence on appeal. On the contrary, in his brief, Husband actually *cites* from testimony received during the presentation of Norfolk Southern's proof-in-chief, apparently indicating that he believes this evidence is helpful to his case. Similarly, at oral argument, when asked about the court's consideration of defense evidence, Husband's attorney stated that it is "important" to his case that the defense evidence be considered. Norfolk Southern, for its part, argued before us that whether we treat this as a directed verdict at the close of the plaintiff's proof or a directed verdict at the end of all the proof, "the result would not change."

In the briefs, neither party appears to make any distinction between the plaintiff's evidence and the defense evidence. Therefore, in view of all of the above, we conclude that the parties have acquiesced in the consideration of all proof presented at trial. This seems to us the most prudent and logical way to proceed, particularly in light of the apparent reliance placed on some of Norfolk Southern's evidence by Husband, the nonmoving party, who is entitled to the benefit of the doubt on factual matters given the case's procedural posture. In addition, Norfolk Southern's evidence is helpful in understanding the import of some of the facts shown by other evidence. We note, however, that we would reach the same holding with respect to the motion if we considered only Husband's evidence.

---

[1] This account of events differs from the recollection of both attorneys at oral argument. Husband's attorney stated that, according to his recollection, the oral argument was granted at the close of all proof. Norfolk Southern's attorney denied this, stating that the motion was granted at the close of the plaintiff's proof, but "we did put one of our witnesses on out of turn." However, the transcript unambiguously indicates that neither recollection is accurate, and the actual sequence of events is as described herein.

## II.

Husband and Wife worked for Progress Rail as torch-cutters. Their job involved dismantling old locomotives and railroad cars and transporting the scrap metal back to Progress Rail's headquarters in Alabama. In 2001, Norfolk Southern sold a locomotive and three railway cars to Progress Rail. Ownership of these items shifted from Norfolk Southern to Progress Rail prior to the commencement of the torch-cutting, but the contract of sale required that the box cars and locomotives be dismantled on Norfolk Southern's rail yard in Chattanooga. The contract states as follows:

> CAR(S) SOLD IN AS IS WHERE IS CONDITION. CAR(S) MUST BE CUT ON SITE WITH CONTRACTOR [i.e., Progress Rail] OWNING AND REMOVING ALL SCRAP, PARTS, AND DEBRIS.

(Capitalization in original.)

Before Husband and Wife began their work, Norfolk Southern stripped the locomotive of all reusable electrical parts, and also vacuum-sucked most of the diesel fuel out of the locomotive's tank. The locomotive was then turned over to Progress Rail. Husband and Wife arrived at the job site in early November 2001, along with foreman James Painter ("Foreman"), also an employee of Progress Rail. Over the course of several days, Husband and Wife first dismantled the rail cars, then started dismantling the locomotive. When they began work on the locomotive, its fuel tank was still inside, so they severed it from the locomotive, leaving the tank itself intact. The tank was approximately 18 feet long, 6 feet wide and 4 feet high, and could hold 4,000 gallons of fuel. According to Husband's testimony, after he and Wife started their work, Foreman inserted a stick into the fuel tank and stated that it had 4 or 5 inches of diesel fuel inside. Husband claims he then witnessed, from approximately 200 or 300 feet away, a conversation between Foreman and two Norfolk Southern employees, apparently about the tank. Husband says he saw Foreman show the stick to the Norfolk Southern employees, and heard him say the word "clean." Later, the tank was moved between 200 and 300 feet away from the area where Husband and Wife were working, to a spot near where Husband says the conversation between Foreman and the Norfolk Southern employees had earlier taken place.

Husband and Wife finished cutting up the remaining parts of the locomotive over the next two days. On approximately three different occasions during those two days, Husband says he saw a Norfolk Southern truck parked next to the fuel tank. He testified that, based upon this observation, combined with Foreman's use of the word "clean" in his conversation[2] with the Norfolk Southern employees, he, Husband, *believed* Norfolk Southern had cleaned the tank of all diesel fuel.

---

[2] Foreman denies that any such conversation took place. For purposes of this motion, however, we assume that Husband's testimony is accurate and that the conversation did occur.

Originally, the Progress Rail team – Foreman, Husband and Wife – had intended to ship the fuel tank back to Alabama intact. However, on the last day of the job, November 13, 2001, there was a change of plans. According to the investigative report from the federal Occupational Safety and Health Administration ("OSHA"),

> the tank was too large for the truck. The onsite supervisor [i.e., Foreman] called the plant for instructions. The plant administrator instructed the supervisor to cut the tank in half so it would fit onto the trucks.

Foreman testified that he did not inform anyone at Norfolk Southern about the decision to torch-cut the tank into sections.

The fuel tank was brought back to the work site. At around 10:00 a.m., Foreman instructed Husband and Wife to begin cutting it. Husband cut a small hole near the top of the tank and sniffed it. Smelling no diesel fumes, and *believing* that the fuel had been cleaned out, he concluded that the tank was safe for cutting. On cross-examination, Husband was asked whether, on "prior jobs, when you had cut up a fuel tank, you had checked to make sure that tank was clean before you started cutting on it?" He replied, "Yes." He was then asked, "But you didn't this time?" He replied, "No." Husband later admitted that he and Wife "could have" checked the tank for fuel with a stick, as Foreman had done previously, "but we didn't do it because we were sure – we believed that the tank was clean." Trusting such a "belief" appears to be a violation of Progress Rail's safety rules, which mandate that "[b]efore torching begins, the area shall be inspected and combustible or flammable materials removed" and further that "[n]o welding, cutting, [or] other hot work may be performed on used drums, barrels, tanks (pressurized or not) or other containers until they have been cleaned so thoroughly as to be absolutely certain that there are no flammable material[s] present[.]"

Husband and Wife stationed themselves on opposite sides of the tank and began cutting each side from top to bottom. When Wife got approximately two-thirds of the way down to the bottom, her torch-cutter ignited the inside of the tank, apparently due to the existence of fuel, and there was an explosion and fire. Wife suffered third degree burns to her face, head and neck, and second and third degree burns to her torso, back, arms and legs. She died from her injuries two weeks after the accident.

A subsequent OSHA investigation found safety violations by Progress Rail. Husband filed a lawsuit against Progress Rail in Alabama on May 9, 2002. That case was later dismissed after Husband and Progress Rail reached a settlement, the details of which are not disclosed in the record. Progress Rail's liability is not at issue in this case.

On November 6, 2002, Husband filed suit in the trial court against Norfolk Southern. His complaint alleges that Norfolk Southern failed to maintain its premises in a reasonably safe condition; failed to provide Wife with a reasonably safe place to work; failed to warn Wife about a dangerous condition of which it was aware; failed to clean the tank after assuming a duty to do so;

-4-

and failed to comply with OSHA regulations and thus, according to Husband, committed negligence per se. As will be seen, Husband's focus on appeal is on the latter three claims: failure to warn, failure to discharge an assumed duty, and failure to comply with OSHA regulations.

In its answer, Norfolk Southern denied all of Husband's operative allegations and also asserted several affirmative defenses, including a claim that Wife's recovery is barred by the workers' compensation statutes and a claim that Wife's own negligence bars Husband's recovery under the doctrine of comparative fault. At trial, Norfolk Southern also claimed that it is not liable because it sold the locomotive on an "as-is, where-is" basis.

Husband's claims were tried to a jury. At the conclusion of Husband's case, Norfolk Southern made a motion for a directed verdict. As noted earlier, by agreement of the parties, three of Norfolk Southern's witnesses were allowed to testify out of turn after the motion was filed. The motion was then argued. The trial court granted Norfolk Southern a directed verdict, finding no evidence that Norfolk Southern owed a duty under the facts before the court. Husband appeals.

III.

"For a negligence case to go before a jury, the plaintiff has the burden to present facts sufficient to establish the necessary elements of negligence." *Doe v. Linder Const. Co., Inc.*, 845 S.W.2d 173, 183 (Tenn. 1992). "If, as a matter of law, the plaintiff has failed to allege or prove facts sufficient to establish notice, the existence of the duty to act, breach of the duty, or proximate cause, dismissal, summary judgment, or a directed verdict would be appropriate." *Id.* (quoting *Tedder v. Raskin*, 728 S.W.2d 343, 349 (Tenn. Ct. App. 1987). More succinctly,

> "[t]he plaintiff in a negligence case must offer some material evidence showing the existence of a duty and an injury proximately caused by a breach of that duty." The standard of review in this case, then, is whether there is any disputed genuine issue of material fact concerning the elements of the alleged cause of action. If not, the dismissal of the complaint must be affirmed.

*Id.* (*quoting Tedder*, 728 S.W.2d at 349) (citation omitted).

There was some dispute between the parties at oral argument regarding whether, for purposes of the instant case, the existence of duty (and the element of foreseeability as a component of duty) is a question for the jury or for the judge. In a sense, the correct answer is: both. Although it is commonly stated that duty is a question of law to be decided solely by the judge, this formulation oversimplifies the issue somewhat. As the Supreme Court has stated:

> It is commonplace to say that a particular defendant owes a duty to a particular plaintiff, but such a statement, although not incorrect, merges two distinct analytical steps. It is for the court to determine,

-5-

as a matter of law, what characteristics must be present for a relationship to give rise to a duty the breach of which may result in tort liability. It is for the jury to determine whether the facts in evidence establish the elements of that relationship. Thus, the jury decides the question of duty only in the sense that it determines whether the proofs establish the elements of a relationship which the court has already concluded give rise to a duty as a matter of law.

*Kelley v. Middle Tennessee Emergency Physicians, P.C.*, 133 S.W.3d 587, 598 (Tenn. 2004) (*quoting Smith v. Allendale Mut. Ins. Co.*, 303 N.W.2d 702, 710 (Mich. 1981)). In the instant case, with the exception of the regulatory interpretation question *vis-a-vis* OSHA, the issues raised relate to "whether the facts in evidence establish the elements of [a duty] relationship," *id.* 133 S.W.3d at 598, rather than what characteristics constitute such a relationship as a matter of law. Hence, we review the evidence before us to determine whether the necessary predicate facts to establish duty exists in the record and we do so pursuant to the regular standard of review of a directed verdict in a jury case.

A motion for a directed verdict under Tenn. R. Civ. P. 50.01 "is appropriate only when the evidence is susceptible to but one conclusion." *Alexander v. Armentrout*, 24 S.W.3d 267, 271 (Tenn. 2000). In reviewing whether a trial court properly granted a motion for a directed verdict, we must "take the strongest legitimate view of the evidence favoring the opponent of the motion." *Id.* (*quoting Long v. Mattingly*, 797 S.W.2d 889, 892 (Tenn. Ct. App. 1990)). "Furthermore, all reasonable inferences in favor of the opponent of the motion must be allowed and all evidence contrary to the opponent's position must be disregarded." *Childress v. Currie*, 74 S.W.3d 324, 328 (Tenn. 2002). If reasonable minds could differ as to the conclusions to be drawn from the evidence presented, the motion must not be granted, and, if it was granted, the trial court's ruling must be reversed on appeal.

Husband argues that the evidence is sufficient to support three separate theories of duty. We will address these theories in turn, in the following order: first, whether Norfolk Southern voluntarily assumed a duty to clean the tank; second, whether Norfolk Southern had a common-law duty to warn Wife about a danger of which it allegedly had superior knowledge, namely the presence of diesel fuel in the fuel tank; and third, whether Norfolk Southern violated OSHA regulations and thus committed negligence per se.

IV.

Husband cites two separate factual bases for his claim that Norfolk Southern voluntarily assumed a duty to clean the tank. First, he argues that Norfolk Southern undertook to clean the tank *prior* to the arrival of the Progress Rail team. Second, he argues that Husband saw actions that indicated to him that Norfolk Southern employees were again cleaning the tank during the two days prior to the accident. Having thoroughly reviewed the record, we find no evidence to support either argument.

Husband first argues that, before Husband and Wife even arrived at the job site, Norfolk Southern assumed a duty to drain the tank of diesel fuel and was therefore obligated to complete the job. In support of this proposition, he cites the following deposition testimony by Norfolk Southern's diesel shop foreman, Greg Swany – testimony offered by Husband at trial:

> Q. What effort was made to drain any diesel fuel?
>
> A. We would have typically pumped the diesel fuel out of the tank.

Husband's brief, however, does not cite the testimony that occurred immediately before that exchange, which was as follows:

> Q. During those months it sat at Chattanooga Diesel Shop, what effort was made to make sure that no diesel fuel was in this tank?
>
> A. None, that I'm aware of. When you say no diesel fuel, you mean no diesel fuel?
>
> Q. Right.
>
> A. Yeah, none.

Nor does Husband's brief cite the further testimony from Mr. Swany, two pages later in the same deposition, that the pumping process he had just described "does not totally deplete the tank of all traces of diesel fuel."[3] Yet these exchanges belie Husband's assertion that the evidence creates a fact issue regarding whether Norfolk Southern undertook to clean the tank of all diesel fuel. They show, in fact, that the very witness relied upon by Husband to establish the alleged assumption of duty actually testified just the opposite, that Norfolk Southern did *not* undertake to *clean* the diesel fuel. The bare snippet of Mr. Swany's testimony relied upon by Husband – the witness's statement that "we would have typically pumped the diesel fuel out of the tank" – certainly does not by itself give rise to a reasonable inference that Norfolk Southern undertook to *clean* the fuel tank of all diesel fuel, as opposed to merely undertaking to remove fuel for later use.

The theory that Norfolk Southern pumped out the fuel for later use is supported by an excerpt from Mr. Swany's live testimony, also quoted in Husband's brief:

> Q. Now, there's been some testimony in this case that there had been some diesel fuel that had been removed from this particular tank. What, if any, knowledge do you have regarding that?

---

[3]This last deposition excerpt was read into the record without objection during Norfolk Southern's cross-examination of Husband's expert witness, Dr. Tyler Kress.

A. When the locomotive came to the diesel shop at first . . . there was some remaining diesel fuel in the tank. And as part of . . . the part *salvaging process* that we did on the locomotive, we would have pumped the *majority of the diesel fuel* out of the tank, and we did.

(Emphases added.) Husband cites this testimony as establishing a duty to fully clean the tank, but in fact it proves just the opposite. If Norfolk Southern only undertook to pump out a "majority" of the fuel – not all of it – and did so as part of a "salvaging process," as opposed to a cleaning operation, that directly contradicts Husband's theory that Norfolk Southern assumed a duty to thoroughly clean the tank. In the cross-examination of Mr. Swany by Husband's counsel, this point was clarified further:

Q: . . . The diesel fuel shop must have a process by which it can safely dispose of diesel fuel, doesn't it?

A: Dispose of it?

Q: Yes.

A: We don't dispose of it. We use it.

Q: You reuse it?

A: Yes, sir.

Q: Okay. You don't dispose of old or used or contaminated diesel fuel?

A: Would you like an explanation?

Q: Please.

A: I mean, the reason for removing the fuel from the tank is, we have a boiler or an array of boilers from the shop, and the removed diesel fuel from those tanks goes into the fuel to operate those boilers. It doesn't go back into the locomotives. It goes into operating those boilers.

The trial court, addressing this issue during the parties' arguments on Norfolk Southern's motion, put it thusly:

I cannot see how Mr. Swany volunteered to anything or assumed any duty there. He stated very clearly, and it's uncontradicted, I

-8-

> haven't heard anything to the contrary, that *they pumped it out so that they could use the diesel fuel.* They got as much out of it as they could so they could use it to run their boilers. I mean, that's the only reason they did it.

(Emphasis added.) When asked by this court at oral argument whether Husband had "present[ed] any proof that they undertook to clean it . . . as opposed to just some proof that they did pump the fuel out," Husband's counsel conceded, "He didn't use the word 'clean.' No, sir."

Taking at face value the evidence relied upon by Husband to support his first "duty" argument, with all reasonable inferences in his favor, the facts simply do not support the conclusion that Norfolk Southern undertook to completely clean the fuel tank of all fuel and fuel residue. In addition, we note that even if Norfolk Southern had undertaken such a duty, Husband's own testimony establishes that he and Wife cannot have been relying on the fulfillment of that purported duty when they decided to proceed with the torch-cutting. By the morning of the accident, they already knew that the tank had contained fuel after their arrival on site, as they had seen Foreman test the tank for fuel and discover four to five inches of it in the bottom. Husband testified that he saw this, and that Wife was "standing right next to him." Thus, the factual predicate underlying the testimony of Husband's expert, Dr. Tyler Kress, that "this [tank] had been in the diesel shop for weeks previous to this . . . and that hazard was there and *unknown to the – undetected by the supervisor [i.e., Foreman] and the workers*" (emphasis added) is flatly contradicted by the evidence before us.

This latter point segues into Husband's second assumption-of-duty argument: that Norfolk Southern assumed a duty to clean the tank *after* Foreman's above-mentioned discovery of fuel in the bottom of the tank. As noted earlier, Husband testified that about three days before the accident, Foreman inserted a stick into the tank, stated that the tank had 4 or 5 inches of fuel inside, then showed the stick to two Norfolk Southern employees and said the word "clean." This is the only word Husband heard. He says he heard this word at a distance of 200 to 300 feet. Husband then saw a Norfolk Southern truck parked next to the tank approximately three times over the next two days.

These facts simply are not enough to meet Husband's evidentiary burden. A single overheard word accompanied by extremely ambiguous conduct does not establish anything of significant value or relevance. Taking all of Husband's testimony as true, the facts do not give rise to a reasonable inference that Norfolk Southern assumed a duty to clean the tank. They support the conclusion that Husband *believed* Norfolk Southern had assumed such a duty, but it appears, on these facts, to have been an unreasonable and unjustified belief. In any event, Husband's beliefs are not at issue here; the issue is Norfolk Southern's actions, specifically their alleged assumption of a duty. On that count, there simply is no evidence to justify submitting this question to a jury.

Viewing the evidence in the light most favorable to Husband, we find no indication that Norfolk Southern took any action or made any representation that would have indicated they had

assumed a duty to clean the fuel tank of all fuel. Husband's contention to the contrary is found to be without merit.

V.

As a separate ground for relief, Husband argues that Norfolk Southern had superior knowledge of a dangerous condition and therefore had a common-law duty to warn Wife of that condition. However, the facts clearly do not bear out this contention.

Husband offers no evidence that Norfolk Southern was aware of the Progress Rail team's intention to cut the fuel tank with a torch-cutter. In fact, the evidence is undisputed that Norfolk Southern was never specifically made aware, in advance of the actual cutting, that Progress Rail planned to cut the tank on site. We note that the contract between Norfolk Southern and Progress Rail does not require the fuel tank to be *torch-cut*; it mandates only that the locomotive, not necessarily each individual part thereof, "be cut on site." In addition, Mr. Swany of Norfolk Southern testified that

> I had no reason to believe, in my wildest dreams, that anybody would be cutting on that fuel tank with torches. If they had asked me, we would have gladly cleaned it for them.

Husband has presented no evidence to the contrary, and although we must give him the benefit of the doubt on factual matters, that benefit only extends so far. Only *reasonable* inferences are to be drawn in his favor, and where he has presented no evidence to support an inference – such as, here, an inference that Norfolk Southern foresaw or should have foreseen the tragedy that befell Wife – we are constrained to conclude that the inference is unreasonable. Put another way, as this Court has previously stated,

> [i]f reasonable persons could draw conflicting conclusions, the case should go to the jury [rather than being settled by directed verdict]. These conclusions, however, *cannot be based on speculation, conjecture, or guesswork.*

*Nee v. Big Creek Partners*, 106 S.W.3d 650, 653 (Tenn. Ct. App. 2002) (emphasis added; citations omitted). In sum, Husband has not introduced evidence from which a jury could reasonably conclude or infer that Norfolk Southern should have foreseen Progress Rail's last-minute decision to torch-cut the fuel tank, and without such foreseeability, Norfolk Southern cannot truly be said to have had knowledge of the dangerous condition, since there was no danger unless the torch-cutter was to be used.

Secondly, and perhaps even more importantly, the record in this case does not convince us that a jury could reasonably conclude that Wife lacked knowledge of the existence of some fuel or residue in the tank. The possibility that there might be fuel in a fuel tank is fairly self-evident. It

seems to us that a reasonable jury would have to conclude that any person aware of a previously-used fuel tank's intrinsic nature would be on constructive notice that it might potentially contain fuel. This is especially true in light of the business of Progress Rail and the work that Husband and Wife were engaged in. As Norfolk Southern argues in its brief, "any sophisticated company that is in the specific business of torch cutting railroad cars and locomotives is aware that fuel tanks may contain combustible materials and constitute hazardous conditions." Moreover, Husband's own testimony on cross-examination demonstrates that he, at least, had such an awareness:

> Q: ... [Y]ou knew it was a fuel tank?
>
> A: Yes.
>
> * * *
>
> Q: And you knew that fuel was flammable?
>
> A: Yes.

Again, Husband has not presented any evidence to the contrary on these points, nor has he suggested that Wife was any less aware than he of the fuel's flammability or of the likelihood that a fuel tank may contain fuel.

The case cited by Husband in support of the common-law duty to warn, ***Southeastern Steel and Tank Maint. Co. v. Luttrell***, 348 S.W.2d 905 (Tenn. Ct. App. 1961), actually reiterates the duty's inapplicability to a situation such as this one, wherein the very nature of the object in question makes the hazard intrinsically obvious. In support of its ruling on this point, the ***Luttrell*** court stated as follows:

> Where [] property is delivered to a bailee for work to be performed . . . on it, the bailor is liable to the bailee for defects likely to cause injury in the process of performing the work *if such defects are not common to the particular species of property*, and if they are known, or should have been known, to the bailor, and no notice of them is given to the bailee.

*Id.* at 907 (*quoting* 8 C.J.S. *Bailment* § 52) (2008) (emphasis added). The presence of fuel in a fuel tank, if it can be regarded as "defect" at all, is certainly a "defect[] . . . common to the particular species of property."

Moreover, as noted earlier, Husband, with Wife standing beside him, actually witnessed Foreman's discovery of fuel in the tank approximately three days before the accident, and he never saw anyone clean the tank after that point. Again quoting from his cross-examination:

-11-

Q: Let's talk just for a minute about this accident here at Chattanooga. You saw [Foreman] put a stick down that fuel tank and pull it out and saw four or five inches of liquid on the bottom of that stick?

A: Yes.

* * *

Q: [Y]ou knew that that liquid was fuel?

A: Yes.

Q: And you could even smell it?

A: Yes.

Q: And [Wife] was standing right next to you when this happened?

A: Yes.

Later, on redirect examination, the following exchange occurred between Husband and his attorney:

Q: Daniel, when you overheard the conversation between [Foreman] and the Norfolk Southern employees, was [Wife] close enough to overhear it as well?

A: Yes.

Q: Did you ever discuss with [Wife], after this, that there might be fuel in the tank?

A: Yes.

As can be seen, the parties agree that Husband and Wife were both aware of the presence of fuel inside the tank in the immediate aftermath of Foreman's use of the stick to measure the fuel. Thus, in order to be seen as lacking knowledge of the hazard at the time of the accident, Husband and Wife would have needed to become aware of facts indicating that the tank had been cleaned at some point after Foreman's measurement. Yet, in fact, they did not witness it being cleaned, nor were they told that it had been cleaned. Quoting again from Husband's testimony on cross-examination:

Q: [D]uring that couple of days that you were cutting up the locomotive, while that fuel tank sat a couple hundred feet away, you

-12-

never saw anybody from Norfolk Southern put anything in that fuel tank and pump it out?

A: I looked and I saw a truck, but I was busy working and I did not . . . I believe that they were cleaning it or emptying it.

Q: You never saw them doing anything, putting anything in that tank, did you?

A: Other than the stick, no.

\* \* \*

Q: Okay. Just so we're clear, so you never saw Norfolk Southern clean out the tank?

A: No. I looked and I *thought* they had cleaned it.

\* \* \*

Q: After the tank was moved, you never saw [Foreman] over there, trying to clean that tank out?

A: I saw them over there, [Foreman] and someone from Norfolk Southern.

Q: But you never saw [Foreman] cleaning out the tank?

A: No.

Q: And [Wife] and you were working close by each other?

A: Yes.

(Emphasis added). The evidence is undisputed that Husband and Wife saw that the tank contained fuel, or at least fuel sludge or residue, and that neither of them witnessed that material subsequently being removed, nor received any affirmative assurances that it had been removed. It is difficult to see how those facts could lend themselves to the conclusion that anyone had *superior* knowledge of the fuel's continued presence in the tank. If Husband or Wife had asked someone at Norfolk Southern whether the tank was *clean*, and had been told that it was, then our analysis would, of course, change. On these facts, however, they had no valid reason to believe the tank was clean and every reason to believe that it might still contain fuel. They cannot close their eyes to an obvious danger and then claim they knew nothing about it.

-13-

In light of the facts discussed herein, it would be unreasonable for a jury to conclude, based upon this evidence, that Wife lacked knowledge of a dangerous condition such that Norfolk Southern's knowledge of that danger was superior. Husband's argument is without merit.

## VI.

Finally, Husband claims that Norfolk Southern violated federal health and safety regulations regarding the safe use of cutting and welding equipment, and, as a consequence, was guilty of negligence per se. Specifically, he cites OSHA regulation 1910.252(a), concerning fire safety in welding and cutting operations:

> Management. Management shall recognize its responsibility for the safe usage of cutting and welding equipment on its property and:
>
> * * *
>
> (D) Advise all contractors about flammable materials or hazardous conditions of which they may not be aware.

29 C.F.R. § 1910.252(a)(2)(xiii) (2008).

We note first that this regulation, which appears under the subheading "Special precautions," is applicable only "[w]hen the nature of the work to be performed falls within the scope of paragraph (a)(1)(ii) of this section." Paragraph (a)(1)(ii) states: "If the object to be welded or cut cannot be moved and if all the fire hazards cannot be removed, then guards shall be used to confine the heat, sparks, and slag, and to protect the immovable fire hazards." Given the undisputed testimony that the fuel tank was in fact moved around the Norfolk Southern property on at least three occasions (from inside the locomotive to outside of the locomotive, then from the job site to approximately 200 - 300 feet away and back), and given that Husband's whole argument is premised on the notion that the sole fire hazard, the diesel fuel, *could* have been removed, we are not at all sure that § 1910.252(a)(2)(xiii) even applies. However, as neither party has raised this point, we will not decide it and will proceed on the assumption that the regulation does apply.

Norfolk Southern argues that it should not be considered "management" for purposes of the regulation in question. It alleges that there is a discrepancy between the definition of "supervisor" – a term that both parties agree applies to Foreman, who is a Progress Rail employee, not a Norfolk Southern employee – and the claim that Norfolk Southern should be considered "management." Husband responds by citing the testimony of his expert witness, Dr. Kress, who stated that Norfolk Southern should indeed be considered "management" under the regulatory scheme in question.

We, of course, are not bound by the testimony of an expert witness with regard to the interpretation of a federal regulation, which is a question of law. However, we are inclined to agree with Dr. Kress's testimony that there is not necessarily a contradiction in this context between

"management" referring to Norfolk Southern and "supervisor" referring to a Progress Rail employee. On the contrary, our reading of the regulation leads us to believe that the possibility of such a result was intended by the drafters of the regulation. The very first section of the regulation refers to the shared "responsibilities of welders and cutters, their supervisors *(including outside contractors)* and those in management *on whose property* cutting and welding is to be performed." 29 C.F.R. § 1910.252(a)(1) (emphases added). Although "management" is nowhere defined in the OSHA regulations, it appears to refer here to the operator of the property on which the cutting or welding is taking place, not necessarily to the employer of either the supervisor or the workers. Indeed, as the regulation explicitly states that "outside contractors" can be "supervisors," it would seem to follow necessarily that "management" need not directly employ such "supervisors." As such, and having found no helpful precedent to help us define "management" in this context, we are disinclined to decide against Husband on this ground.

However, even if Norfolk Southern is "management" for OSHA purposes, it still did not violate § 1910.252(a)(2)(xiii)(D), for the same reasons noted in a previous section: on the facts of this case, fuel in a fuel tank does not constitute "flammable materials or hazardous conditions *of which [contractors] may not be aware*." On the contrary, Husband's testimony clearly states that Foreman measured the fuel with a stick and then showed that stick to two Norfolk Southern employees. Put another way, according to Husband's own version of events, Norfolk Southern knew that Progress Rail's supervisor was aware of the fuel prior to the accident; thus, both from Norfolk Southern's perspective and in point of fact, it was not a "hazardous condition of which [contractors] may not be aware." If Foreman had asked Norfolk Southern to clean the tank and Norfolk Southern had failed to do so, that would potentially reestablish Norfolk Southern's purported OSHA duty to inform the contractors of the hazard – but again, Husband's testimony does not establish that any such request was made. As already noted, the mere fact that Husband overheard the word "clean" from 200 or 300 feet away, and that the tank was then relocated for several days, cannot, without more, give rise to a reasonable presumption that Norfolk Southern was asked to clean the tank or that it agreed to do so. At most, Husband's proof suggests that Husband *believed* the tank had been cleaned, but the evidence does not support the conclusion that this belief was reasonable, nor that Norfolk Southern was aware of it – and Norfolk Southern cannot be penalized for failing to disabuse Husband of an unreasonable belief of which Norfolk Southern was unaware.

In sum, the evidence establishes that, as far as Norfolk Southern was concerned, Progress Rail's employees, including Wife, were not just constructively aware of the hazard (in the sense that fuel tanks tend to contain fuel), they were also actually, subjectively aware of the hazard, and had no valid reason to believe it had been removed. Therefore, even if § 1910.252(a)(2)(xiii) applies on these

facts, and even if Norfolk Southern is "management," no OSHA violation occurred, and therefore negligence per se does not arise. This claim is without merit.[4]

## VII.

The judgment of the trial court is affirmed. Costs on appeal are taxed to the appellant, Daniel Pantoja Garcia. This case is remanded to the trial court for collection of costs assessed below, pursuant to applicable law.

_____
CHARLES D. SUSANO, JR., JUDGE

---

[4] Because we resolve this issue in Norfolk Southern's favor, we do not decide other issues raised by Norfolk Southern: whether, if indeed Norfolk Southern is "management" for OSHA purposes, it therefore follows that this accident falls under the worker's compensation statute, barring this lawsuit; or what effect, if any, the "as is/where is" nature of the contract would have had on any possible duty, if a duty had otherwise arisen, under OSHA or otherwise.